## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| KHUONG TRAN, derivatively on behalf of BEST BUY CO., INC., | Civil Action No. |
| Plaintiff, | |
| v. | |
| HUBERT JOLY, SHARON MCCOLLAM, BRIAN J. DUNN, JAMES L. MUEHLBAUER, RICHARD M. SCHULZE, MATTHEW H. PAULL, HATIM A. TYABJI, KATHY J. HIGGINS VICTOR, RONALD JAMES, ROGELIO M. REBOLLEDO, GEORGE L. MIKAN III, GÉRARD R. VITTECOQ, RUSSELL P. FRADIN, SANJAY KHOSLA, LISA M. CAPUTO, BRADBURY H. ANDERSON, ALLEN U. LENZMEIER, ELLIOT S. KAPLAN, MICHAEL A. VITELLI, FRANK D. TRESTMAN, J. PATRICK DOYLE, DAVID W. KENNY, THOMAS L. MILLNER | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| BEST BUY CO., INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.    Plaintiff Khuong Tran ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Best Buy Co., Inc. ("Best Buy" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust

enrichment from 2010 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      According to its public filings, Best Buy is a multinational retailer of consumer electronics, home office products, entertainment software, appliances, and related services. The Company operates in two reportable segments: Domestic and International.

3.      Throughout the Relevant Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operation, and prospects. Specifically, defendants issued improper statements in Company press releases and conference calls that touted the Company's positive financial results, significant growth, and presented aggressive forward guidance. However, unbeknownst to the public, the Company was facing declining demand for its products and defendants had no reasonable basis to present such aggressive forecasts as they had. In reality, the Company was encountering lowered demand and weak sales for its flag-ship units, including its TVs, entertainment hardware, and software products. Yet, instead of lowering Best Buy's earnings guidance accordingly, defendants increased the Company's earnings guidance, assuring investors that sales would pick-up in the back-end of the fiscal year.

4.      While disseminating an overly optimistic business outlook for the Company with no reasonable basis to do so, defendants caused the Company to execute repurchases of Best Buy's own stock at inflated prices. These repurchases were a deliberate and calculated move by defendants to manipulate the Company's earnings per

share ("EPS") figures and EPS guidance in the midst of weak sales and fast-declining demand for the Company's products.

5.      Ultimately, defendants could not maintain the ruse that the Company would achieve its previously forecasted aggressive guidance for much longer.  In fact, when defendants inevitably lowered Best Buy's earnings guidance, they acknowledged that the adjusted guidance would have been even lower *but for the repurchased shares*.  When the truth about the Company's inability to meet its business outlook was revealed, its market capitalization fell by approximately $6.3 billion or 31.2% and several Best Buy stockholders filed a securities fraud class action against the Company.

6.      As a result of defendants' materially false and misleading statements and failure to maintain adequate internal controls, Best Buy stock traded at artificially inflated levels during the Relevant Period.  After the revelations described herein seeped into the market, the Company's stock price fell 14%, from a closing price of $41.70 per share on December 13, 2010 to $35.52 per share on December 14, 2010.

7.      Moreover, during the Relevant Period, while in possession of material, adverse, non-public information and utilizing their knowledge of Best Buy's true health and inflated stock price for their own benefit, certain of the defendants, including a current director of the Company, sold their personally held shares of Best Buy stock, collectively reaping proceeds of over *$11 million*.

8.      Accordingly, as a result of defendants' breaches, the Company has been damaged.

9.      As a result of the misconduct set forth herein, on November 26, 2013,

Plaintiff issued a demand pursuant to Minnesota law (the "Demand") on the Board to commence an action against certain current and/or former directors and executive officers of the Company. A true and correct copy of the Demand is attached hereto at Exhibit A.

10.    On December 24, 2013, Plaintiff's counsel received a letter from William R. Skallerud ("Skallerud") of Best Buy's Legal Department, confirming that the Board received the Demand. In addition, and without citing any provision of Minnesota law, Skallerud's letter requested "appropriate documentation" of Plaintiff's ownership of Best Buy stock. A true and correct copy of Skallerud's letter is attached hereto at Exhibit B.

11.    Despite the fact that Skallerud's letter cited no authority in connection with the request for documentation of Plaintiff's Best Buy stock ownership, on January 17, 2014, Plaintiff's counsel sent a letter to Skallerud which included the requested documentation. A true and correct copy of the January 17, 2014 correspondence is attached hereto at Exhibit C.

12.    Notwithstanding the fact that it took nearly a month for defendants to even acknowledge the Demand, now over *eighteen months* have passed and the Board has provided Plaintiff with literally no substantive response to the Demand whatsoever.

13.    Clearly, the Board's complete disregard of the Demand, which resulted in its functional refusal, is improper and demonstrates the Board's lack of diligence and good faith.

14.    Thus, this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §

1332(a)(2) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

16. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District. One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

17. Plaintiff is a current shareholder of Best Buy and has continuously held Best Buy stock since August 2010. Plaintiff is a citizen of Texas.

18. Nominal defendant Best Buy is a Minnesota corporation, with its principal executive offices at 7601 Penn Avenue South, Richfield, Minnesota 55423.

19. Defendant Hubert Joly ("Joly") has served as the President, Chief Executive Officer ("CEO") and director of the Company since September 2012. Upon information and belief, defendant Joly is a citizen of Minnesota.

20. Defendant Sharon McCollam ("McCollam") has served as the Chief Administrative Officer ("CAO") and Chief Financial Officer ("CFO") of the Company since December 2012. Upon information and belief, defendant McCollam is a citizen of

Minnesota.

21.    Defendant Brian J. Dunn ("Dunn") served as the Company's CEO and director from June 2009 until his resignation in April 2012.  In addition, Dunn served as the Company's President and Chief Operating Officer ("COO") from February 2006 until June 2009.  Previously, defendant Dunn held various positions in the Company since 1985.  Upon information and belief, defendant Dunn is a citizen of Minnesota.

22.    Defendant James L. Muehlbauer ("Muehlbauer") served as the Company's Executive Vice President and CFO from April 2008 until October 2012.  Upon information and belief, defendant Muehlbauer is a citizen of Minnesota.

23.    Defendant Richard M. Schulze ("Schulze"), the founder of the Company, served as the Company's Chairman from 1994 until his resignation in 2012, and as CEO from 1983 until 2007.  Defendant Schulze was a director of the Company since founding the Company in 1966 until 2012.  Upon information and belief, defendant Schulze is a citizen of Minnesota.

24.    Defendant Matthew H. Paull ("Paull") served as a director of the Company from 2003 until April 2013, and as Lead Independent Director from 2010 until 2013.  Upon information and belief, defendant Paull is a citizen of Illinois.

25.    Defendant Hatim A. Tyabji ("Tyabji") has served as the Company's Chairman since July 2012, and as a director since April 1998.  In addition, defendant Tyanji served as a Chairman of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Tyabji is a citizen of Nevada.

26.     Defendant Kathy J. Higgins Victor ("Victor") has served as a director of the Company since November 1999.  Upon information and belief, defendant Victor is a citizen of Minnesota.

27.     Defendant Ronald James ("James") served as a director of the Company from May 2004 until April 2013.  Upon information and belief, defendant James is a citizen of Minnesota.

28.     Defendant Rogelio M. Rebolledo ("Rebolledo") served as a director of the Company from August 2006 until June 2012.  Upon information and belief, defendant Rebolledo is a citizen of Mexico.

29.     Defendant George L. Mikan III ("Mikan") served as a director of the Company from April 2008 until December 2012, and served as the Company's Interim CEO from April 2012 until September 2012.  Upon information and belief, defendant Mikan is a citizen of Minnesota

30.     Defendant Gérard R. Vittecoq ("Vittecoq") has served as a director of the Company since September 2008.  In addition, defendant Vittecoq served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Vittecoq is a citizen of Switzerland.

31.     Defendant Russell P. Fradin ("Fradin") has served as a director of the Company since April 2013.  In addition, defendant Fradin served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Fradin is a citizen of New York.

32.     Defendant Sanjay Khosla ("Khosla") has served as a director of the

Company since October 2008. Upon information and belief, defendant Khosla is a citizen of Illinois.

33. Defendant Lisa M. Caputo ("Caputo") has served as a director of the Company since January 2009. Upon information and belief, defendant Caputo is a citizen of New York.

34. Defendant Bradbury H. Anderson ("Anderson") has served as a director of the Company since March 2013, and previously served as a director from 1986 until June 2010. In addition, Anderson served as the Company's CEO from 2002 until 2009, COO from 1991 until 2002, and as Chairman of the Board from 2001 until June 2010. Upon information and belief, defendant Anderson is a citizen of Minnesota.

35. Defendant Allen U. Lenzmeier ("Lenzmeier") has served as a director of the Company since March 2013, and previously served as a director from February 2001 until June 2010. Upon information and belief, defendant Lenzmeier is a citizen of Minnesota.

36. Defendant Elliot S. Kaplan ("Kaplan") served as a director of the Company and the Company's Secretary from 1971 until June 2011. Upon information and belief, defendant Kaplan is a citizen of Minnesota.

37. Defendant Michael A. Vitelli ("Vitelli") served as the Company's President of U.S. Operations and Executive Vice President from January 2012 to February 2013, Executive Vice President and President of Americas - Enterprise from March 2010 until January 2012, Executive Vice President of Customer Operating Groups from March 2008 until March 2010, General Manager and Senior Vice President of Home Solutions from

2007 until 2008, and Senior Vice President of Consumer Electronics and Product Management from 2004 until 2007.  Upon information and belief, defendant Vitelli is a citizen of Kansas.

38.    Defendant Frank D. Trestman ("Trestman") served as a director of the Company from 1984 until June 2010.  Upon information and belief, defendant Trestman is a citizen of Minnesota.

39.    Defendant J. Patrick Doyle ("Doyle") has served as a director of the Company since October 2014.  In addition, defendant Doyle served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Doyle is a citizen of Michigan.

40.    Defendant David W. Kenny ("Kenny") has served as a director of the Company since September 2013.  Upon information and belief, defendant Kenny is a citizen of Massachusetts.

41.    Defendant Thomas L. Millner ("Millner") has served as a director of the Company since January 2014.  In addition, defendant Millner served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Millner is a citizen of Nebraska.

42.    Collectively, Joly, McCollam,  Dunn, Muehlbauer, Schulze, Paull, Tyabji, Victor, James, Rebolledo, Mikan, Vittecoq, Fradin, Khosla, Caputo, Anderson, Lenzmeier, Kaplan, Vitelli, Trestman, Doyle, Kenny, and Millner shall be referred herein as "Defendants."

43.    Collectively, Tyabji, Vittecoq, Fradin, Doyle, and Millner shall be referred

to herein as "Audit Committee Defendants."

44.    Collectively, Dunn, Kaplan, Lenzmeier, and Trestman shall be referred to herein as "Insider Selling Defendants."

## DEFENDANTS' DUTIES

45.    By reason of their positions as officers, directors, and/or fiduciaries of Best Buy and because of their ability to control the business and corporate affairs of Best Buy, Defendants owed Best Buy and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Best Buy in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Best Buy and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Best Buy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

46.    Defendants, because of their positions of control and authority as directors and/or officers of Best Buy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Best Buy, each of the Defendants had knowledge of material non-public information regarding the Company.

47.    To discharge their duties, the officers and directors of Best Buy were required to exercise reasonable and prudent supervision over the management, policies,

practices and controls of the Company.  By virtue of such duties, the officers and directors of Best Buy were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

    48.    Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

    a. Review with the management the quality and adequacy of internal controls that could significantly affect the Company's financial statements, and review any special audit steps adopted in light of material control deficiencies;

    b. Review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, or the performance of the internal audit function;

    c. Review management's monitoring of the Company's compliance with laws and the Company's Code of Business Ethics;

    d. Discuss with management the quality and adequacy of the Company's disclosure controls and procedures; and

    e. Meet to review and discuss with management the Company's quarterly and annual financial statements.

## SUBSTANTIVE ALLEGATIONS

### A.    **Company Background**

49.    According to its public filings, Best Buy is a multinational retailer of consumer electronics, home office products, entertainment software, appliances, and related services.  The Company operates in two reportable segments: Domestic and International.  The Domestic segment is comprised of the operations in all states, districts and territories of the United States, operating e-commerce, retail store and call center operations under various brand names including, but not limited to, Best Buy (bestbuy.com), Best Buy Mobile, Geek Squad, Magnolia Audio Video and Pacific Sales. The Company operates Best Buy Mobile stores-within-a-store and offers Geek Squad services in all of its U.S. Best Buy stores.  In addition, the Company operates Magnolia Home Theater, Magnolia Design Center and Pacific Kitchen and Home store-within-a-store experiences in select U.S. Best Buy stores.  The International segment is comprised of: (i) all Canada operations, operating e-commerce and retail store operations under the brand names Best Buy (bestbuy.ca), Best Buy Mobile, Cell Shop, Future Shop (futureshop.ca) and Geek Squad; and (ii) all Mexico operations, operating under the brand names Best Buy (bestbuy.com.mx), Best Buy Express and Geek Squad.  The Company operates Best Buy Mobile store-within-a-store concepts in all Best Buy branded stores in Canada.  In March 2015, the Company's Future Shop and Best Buy stores and websites in Canada were consolidated under the Best Buy brand.  This resulted in permanently closing 66 Future Shop stores and converting 65 Future Shop stores to the Best Buy brand.

50.    As of March 31, 2015, Best Buy employed approximately 125,000 full-time, part-time, and seasonal employees at more than 1,700 stores throughout the Company's Domestic and International segments (51% decrease as compared to over 3500 stores as of March 31, 2011).  The Company was incorporated in the state of Minnesota in 1966 as Sound of Music, Inc.

### B.    Defendants' False and Misleading Statements

### 1.    Defendants Set Aggressive Fiscal Year 2011 ("FY2011") Forecast for Revenue, Comparable Store Sales Growth[1] and EPS, and Reaffirm Guidance Despite Terrible First Quarter 2011 Results

51.    On March 25, 2010, Defendants caused the Company to issue a press release announcing unexpectedly positive fourth quarter 2010 ("4Q10") and 2010 fiscal year ended February 27, 2010 ("FY2010") financial results, overcoming a down economy and beating Wall Street estimates.  Therein, Defendants reported 4Q10 earnings of $779 million and EPS of $1.82, a comparable store sales increase of 7% year over year and market share gains of 260 basis points.  In addition, Defendants issued aggressive FY2011 revenue guidance: $52-$53 billion, and stated that the Company's FY2011 earnings would be $3.45-$3.60 per share.  The press release set forth, in relevant part:

**Best Buy's Fourth Quarter Diluted EPS Increases to $1.82**

\* \* \*

Best Buy Co., Inc., a leading retailer of consumer electronics, today reported

---

[1] The Company's financial filings define "comparable store sales" as a commonly used metric in the retail industry, which compares revenue for a particular period with the corresponding period in the prior year, excluding the impact of sales from new stores opened, and state that Best Buy's comparable store sales is comprised of revenue from stores operating for at least 14 full months, as well as revenue related to call centers, websites, and our other comparable sales channels.

net earnings of $779 million, or $1.82 per diluted share, for its fiscal fourth quarter ended on Feb. 27, 2010 . . . .

\* \* \*

The domestic segment experienced a low double-digit comparable store sales increase in notebook computers and a high single-digit increase in comparable store sales in flat-panel televisions.

\* \* \*

**Fiscal 2010 Annual Results**

\* \* \*

- Total revenue of $49.7 billion, a 10 percent increase year-over-year. . . .

- The company believes domestic market share increased 240 basis points during the 12-months ended Jan. 31, 2010 . . . .

- GAAP net earnings of $3.10 per diluted share, a 30 percent increase year-over-year . . . .

\* \* \*

**Best Buy Establishes Fiscal 2011 EPS Outlook of $3.45 to $3.60**

\* \* \*

- *Revenue of $52.0 billion to $53.0 billion, an increase of 5 percent to 7 percent.*

- *A comparable store sales increase of 1 percent to 3 percent.*

\* \* \*

- *Operating income rate improvement of 30-to-40 basis points driven by both gross profit rate expansion and SG&A [Selling, General & Administrative Expense] leverage.*  Domestic segment operating income rate to improve at the high-end of the above range.

\* \* \*

- *Earnings per diluted share of $3.45 to $3.60, which represents an increase of 10 percent to 14 percent versus fiscal 2010's adjusted diluted EPS.*

52.     The March 25, 2010 press release further stated that the Company would engage in share repurchases during FY2011, thus reducing outstanding shares and positively impacting earnings results.  However, the press release insisted that the Company's FY2011 EPS forecast of up to $3.60 per share was independent of the impact

of such repurchases.  In that regard, the press release stated, in relevant part:

> The company noted that it has $2.5 billion remaining under its existing board-approved share repurchase authorization **and intends to resume share repurchases. However, the impact of potential share repurchases has not been included in the company's fiscal 2011 diluted EPS guidance.**

53.    That same day, during an earnings conference call, defendants Dunn and Muehlbauer reiterated the Company's financial results and business outlook presented in the press release.  Further, defendant Muehlbauer discussed the Company's anticipated repurchase of its stock and its implication on the Company's fiscal year 2011 forecast:

> **James L. Muehlbauer, Executive Vice President, Finance and Chief Financial Officer**
>
> So turning now to fiscal 2011, let me share with you our thoughts on the upcoming year.  **Our plans call for top line revenue of 52 to 53 billion, which represents a 5 to 7% growth year over year. The revenue outlook includes comparable store sales growth between 1 to 3%.**  Additionally, we intend to continue moderating our square footage growth and leverage our existing footprint.
>
> *  *  *
>
> So while I anticipate that we will return to the market to buy back shares*,* **our earnings and EPS guidance for fiscal 2011 does not reflect the impact of share re-purchases.**
>
> *  *  *
>
> **Bringing it all together, we are forecasting annual EPS of $3.45 to $3.60 for fiscal 2011, representing an improvement range of 10 to 14% year over year versus our fiscal 2010 adjusted earnings**.

54.    On the call, Defendants were adamant that the lower margins reported in 4Q10 were the product of deliberate business decisions and that Defendants had intentionally decided to sacrifice margins in order to drive revenue growth.  In fact, defendants Dunn and Vitelli assured analysts that 4Q10 margins played out exactly as expected and that they had a plan to increase margins and revenues in FY2011.  Analysts

challenged Defendants on how they intended to increase margins in FY2011 and whether (and why) they were expecting consumers to be willing to pay the higher prices (*i.e.*, to be "less price sensitive"), which would be required to grow margins.[2]   Defendants avoided answering the question, stating that it was their intentional decision to grow sales that resulted in lower margins:

> [Muehlbauer:]   The gross margin rate came in below our original expectations due to stronger consumer demand in specific product categories, decisions we made to improve our top line revenue and share by growing sales in key categories that have lower margins . . . .
>
> *    *    *
>
> [Analyst:]   And it would seem like if you're going to build on some of the relationships that you built with customers this year and improve your profit rate, it would suggest that those folks are going to be less price sensitive this year than last, so maybe you can clarify that as well?
>
> *    *    *
>
> [Dunn:]   In the Fourth Quarter, the domestic margins basically played out exactly where they thought they would play out. . . .  I think is important context as we look at that margin rate not only this year, but the activities that we see in connectible devices, be it TVs, computing, mobile phones, and other connectible devices into next year.

55.    Regarding Best Buy's competitive position in the market with respect to competition from Amazon, Target and Walmart and how that competition might affect market share, Dunn stated that Best Buy would be "very knowledgeable" about their competitors' actions: "[A]s we do in any kind of competitive environment, we'll be very knowledgeable about what our competition is doing."

---

[2]  The Company was experiencing significant problems with customers using their smartphones while shopping to identify other brick-and-mortar or online retailers like Amazon offering the same products at lower prices.  The pressure to compete on price was hurting the Company's margins.  Conversely, maintaining or increasing margins was hurting the Company's revenues.

56.     On June 15, 2010, Defendants caused the Company to issue a press release announcing its financial results for the fiscal year 2011 first quarter ended May 29, 2010 ("1Q11").  The press release reported earnings of $155 million and EPS of $0.36 for the quarter and revealed that the Company drastically underperformed consensus Wall Street estimates for EPS of $0.50 per share.  Further, the press release disclosed that the Company reported comparable-store sales increase of merely 1.9%, which consequently increased the Company's inventory by 10% year-over-year, and significant Selling, General & Administrative Expense ("SG&A") of $2.5 billion (an increase of 12% year-over-year).  According to the press release, the flat-lining sales were attributed to declining sales of TVs, and in gaming, music, and movies.  Nevertheless, defendant Dunn stressed that there were "many positive indicators in the first quarter, highlighted by the excellent performance of Best Buy Mobile," that gave him "***confidence in [Best Buy's] ability to achieve [its] financial goals this year***."  Defendant Muehlbauer added, "[w]hile our financial results in the fiscal quarter were below expectations, we remain confident that the strategic investments we are making will deliver more robust connected solutions for customers and support increased margin expansion during the fiscal year."  Notwithstanding the underwhelming financial results reported for the quarter, Defendants surprisingly maintained ***all aspects*** of their previously reported fiscal year 2011 sales, revenue, and earnings forecasts.  The press release stated, in relevant part:

> Best Buy Co., Inc. (NYSE:BBY), a leading retailer of consumer electronics, today reported net earnings of $155 million, or $0.36 per diluted share, for its fiscal first quarter ended May 29, 2010, compared with $153 million, or $0.36 per diluted share, for the prior-year period. Diluted earnings per share decreased 14 percent versus the prior-year period's

adjusted diluted earnings per share of $0.42, which excluded the impact of restructuring charges incurred in the prior year's fiscal first quarter. A reconciliation of adjusted diluted earnings per share and other non-GAAP financial measures for the first quarter of fiscal 2010 are presented in the appendix attached to this news release.

*"There were many positive indicators in the first quarter, highlighted by the excellent performance of Best Buy Mobile," said Brian Dunn, CEO of Best Buy.* "These indicators, coupled with the business model changes we are making to create better solutions for the millions of connectable devices we sell, *give me confidence in our ability to achieve our financial goals this year*."

\* \* \*

*The company's selling, general and administrative expense (SG&A) rate for the fiscal first quarter was 23.0 percent of revenue, an increase of 110 basis points when compared to the prior-year period.*

\* \* \*

**Company Affirms Fiscal 2011 Annual Guidance**

*"While our financial results in the fiscal first quarter were below expectations, we remain confident that the strategic investments we are making will deliver more robust connected solutions for customers and support increased margin expansion during the fiscal year," said Jim Muehlbauer, Best Buy's executive vice president of finance and CFO. "We continue to expect solid top-line growth and expansion of our annual operating margin to approximately 5 percent of revenue in fiscal 2011."*

*The company also reiterated its fiscal 2011 outlook and annual diluted EPS guidance as provided on March 25, 2010.*

57.    In the press release, Defendants also disclosed that the Company had resumed repurchases of its common stock:

*During the first quarter of fiscal 2011, the company resumed repurchases of its common stock and acquired approximately 2.5 million common shares.* On May 6, 2010, the company paid a dividend of 14 cents per common share, or $59 million in the aggregate.

58.    That same day, in an earnings conference call, defendants Dunn and

Muehlbauer reiterated the Company's financial results and business outlook presented in the press release. Defendant Dunn acknowledged the Company's underperforming results and blamed it on demand weakness, slower "customer traffic," and a higher than expected increase in SG&A expenses, even though consumer spending had increased from calendar 2009:

**Brian J. Dunn, Chief Executive Officer**

First things first. While there were some positive signs in our results, ***this quarter's earnings were below our expectations*** and that's something I, and everyone on this management team, take very seriously.

***There are two primary drivers behind these results. First, we experienced some variability in customer traffic in the U.S. over of the course of the last three months which resulted in a slightly lower comp than we were expecting.*** Second, we planned for higher SG&A during Q1 to accelerate some of the capabilities to sell more robust solutions for customers. However, ***our SG&A spend still came in higher than we had targeted for the quarter.***

\* \* \*

I'll wrap up my comments now by reiterating that while I'm neither pleased nor satisfied with our first quarter financial results, ***it does not change my confidence that we can and will deliver our annual guidance and drive value for the long term.***

\* \* \*

**James L. Muehlbauer, Executive Vice President, Finance and Chief Financial Officer**

And finally, we continue to expect to deliver our financial goals for the year. ***We are maintaining our annual guidance expectations of strong EPS growth of 10 to 14% driven by top line growth and expansion of our operating margins.***

59.    When questioned by analysts as to the Company's insistence on reaffirming its business outlook notwithstanding the weak financial results reported for the quarter, defendant Muehlbauer steadfastly maintained that the Company expected to meet its

business forecast:

[Analyst]: One more question on the guidance, if you don't mind.  I certainly understand you made it quite clear your SG&A spending for the year is unchanged.  However, *in the first quarter, to be fair, your revenues did fall short of expectations.  When you look at the guidance for the full year, is your confidence still in the 3.45 to 3.60 range predicated on recapturing those revenues, or do you think that SG&A spending may actually be lower than what was first anticipated?*

* * *

[Muehlbauer]:    A couple of pieces there, Alan.  *So we've maintained all aspects of our guidance, so we still see the comp of 1 to 3 for the year.*  As I mentioned in my comments, Q1 has just not been a historically strong indicator of what consumer behavior is going to be for the year. So it's just too early to call out.  So we did fall a little short of our plan in maintaining our guidance of 1to 3.  Clearly there is room in that guidance range, *but clearly we expect to recoup that as we move through the year given the product cycles we see coming, and we'll just have to see what happens during our key selling season around the holiday time, so no changes on that front.*

Correspondingly, same with the EPS guidance.  *Based on what we see today in Q1, 3.45 to 3.60 is still the best range we have for the year.*

* * *

[Analyst]:  Okay.  I guess I still don't understand all things being equal how given your performance in Q1 you could be more optimistic about the remainder of the year than where you were in March.

[Muehlbauer]:  Where are you getting more optimistic….

[Analyst]:  Well...

[Muehlbauer]:  I think what we're saying –

[Analyst]:  *Admittedly you fell short of your expectations in Q1.  You're still backing guidance, which means that you have to exceed your original expectations in the remaining quarters.  Is that not a fair assumption?*

[Muehlbauer]:  *That is fair. But if you look at the weight of the business that's in Q1 versus previous quarters, Q1 is our smallest quarter. It's 10% of our year*.

- 20 -

60.    Defendants further stated during the earnings call:

[Dunn:] [W]hile I'm neither pleased nor satisfied with our first-quarter financial results, it does not change my confidence that we can and will deliver our annual guidance and drive value for the long term.

*  *  *

[Muehlbauer:] While we saw slight comparable-store sales declines in some of our categories, like gaming and home theater, our market share remained essentially in line with expectations.

*  *  *

[W]e've not changed our guidance expectations for the top line, either in total revenue growth or in comp sales.

61.    Defendants attributed the 1Q11 miss in part to weaker sales of lower-end TVs (the 32-37 inch category), stating, in relevant part:

[Analyst:] TV trends did decelerate, right? I think you were down low single digits, previous quarters you were up, if memory serves, high single digits, so something slowed in the TV business, was it lower-end TVs, smaller screen sizes, et cetera?

[Vitelli:] Yes, the 32 to 37 area was shorter for us this quarter. You have two reasons for that. One is, as someone mentioned earlier, the industry itself kind of pulled back in production on that area.

62.    Despite the poor 1Q11 results, Defendants insisted that the Company would deliver forecast FY2011 financial targets and that SG&A spending targets were unchanged. Moreover, Defendants told investors not to get pessimistic about how they believed the year would pan out, in part because Defendants would manipulate the financial "levers," which affect earnings, allowing them to achieve guidance even with slowing sales:

[Muehlbauer:] [O]ur annual SG&A spending plans remain unchanged from previous expectations. First quarter spending growth trends are expected to subside as the year progresses. As we have

- 21 -

demonstrated in the past, this is the area in which we have the most control over the levers. Finally, we continue to expect to deliver our financial goals for the year. We are maintaining our annual guidance expectations of strong EPS growth of 10% to 14%, driven by top-line growth and expansion of our operating margins.

\* \* \*

[Analyst:] If things slow down are you in a position to pull down the SG&A significantly, like could we see it much lower than 6% to 6.5?

[Muehlbauer:] Yes, we can, Gary, because once again, it's predicated on the sales volume that we see.  The leverage that we traditionally pulled and you saw us do over the last couple of years is that we'll adjust labor accordingly as we see sales move up or down versus our expectations . . . .  It's predicated on us delivering our annual operating objectives. So if we incur higher profitability in the year like we did last year, we'll be taking the extent of expense up, but that will be net good news on the bottom line. Conversely, if we see consumer behavior and the water level a little short of where we expect, we'll see some benefit from lower incentive expense year over year. Those levers are there.

\* \* \*

[Muehlbauer:] Our callout in Q1 is that while we're disappointed don't get overly pessimistic that we think the year is going to pan out materially different than we originally thought. It's still very early. We control many of the levers from a spending standpoint and we'll see what the consumer actually does. We're confident that our plans in driving margin expansion into the gross profit lever are going to continue to ramp.

63.    In an effort to convince analysts and investors that there was sufficient sales growth to be had in the remainder of the year, defendants supported their claim that the year would pan out consistent with their projections by stating that "events"—*e.g.*, football season, back-to-school and the holidays—would drive forecasted growth:

[Analyst:] As we step back, obviously it seems like things slowed as the quarter went on from your commentary because you got caught with a little too much inventory and spending was a bit too high. How do you — what's your prognosis for spending the rest of the year? How do you drive customers into your store in what's probably going to stay as a variable consumer spending environment?

[Dunn:] . . . Our traffic's been choppy month by month. I think there
are a couple of things. One, clearly the events. Customers are still coming
out, and as I mentioned in my prepared remarks, spending and spending
well around traditional drive times for us.

64.     Following the Company's press release and conference call, analysts
continued to question Best Buy's ability to meet its FY2011 financial targets and
continued to express skepticism that the Company could achieve the rapid growth
required to meet guidance during the next three quarters:

We believe, however, that seemingly aggressive 2010 EPS guidance sets
the bar to [sic] high and renders shares susceptible to EPS misses over the
next few quarters. . . .  2010 Guidance a Significant Risk. Management
reiterated EPS guidance of $3.45-$3.60, which compares with a current
consensus figure of $3.52.  Following Q1 results, this implies a >25% pick-
up in EPS growth Q2-Q4.[3]

65.     On June 30, 2010, the Company presented at the Oppenheimer & Co.
Consumer, Gaming, Lodging & Leisure Conference ("Oppenheimer Conference").  The
Oppenheimer Conference was hosted by Dave Deno ("Deno"), Best Buy's Senior Vice
President of Finance and CFO, International, and Bill Seymour ("Seymour"), Best Buy's
Vice President of Investor Relations.  During the Oppenheimer Conference, Defendants
again acknowledged that the first quarter results had fallen short of where even the
Company had expected, but nevertheless, again reiterated the FY2011 financial forecast
of 5%-7% revenue growth, 1%-3% comparable store sales growth, $3.40-$3.60 EPS,
notwithstanding the known two sequential quarters of weakness in sales demand.

66.     Deno provided further support to investors' expectations that upcoming

---

[3] Analyst Report on Best Buy, Inc. by Oppenheimer & Co. Inc. ("Oppenheimer"), dated
June 15, 2010.

- 23 -

"events" (including back-to-school and Memorial Day) would drive sales, consistent with

defendant Dunn's June 15, 2010 representations that consumer demand is "episodic" and

focused on various events.  In Best Buy's case, these events would purportedly create

large spikes in sales and revenues.  As such, Deno continued on the theme that FY2011

was going as planned and the Company was in position to meet EPS guidance despite

objective indicators to the contrary:

> [Deno:] Let's talk about our 2011 fiscal guidance and overview. . . . And you can see our sales growth, from nearly $50 billion to $53 billion.
>
> Comps will be somewhere between 1% and 3%, and we have in our plans operating margin expansion of 30 to 40 basis points. . . .
>
> If you look at our earnings per share growth, it's 10% to 14% over the year, $3.45 to $3.60, capital of about $850 million. . . .
>
> So our outlook for the year, even though our first quarter was a little bit weaker than we had hoped, is still unchanged. . . . So this is our guidance for the year, we are holding to it and expect to achieve these targets.
>
> *  *  *
>
> [Seymour:] And I would — just a comment on how did the sort of the year — our fiscal year rolls out.  First quarter is — I think can use the word episodic as a good indicator.  First quarter is not quite 10% of our earnings.  A lot of the event-based reasons why people come to the store and the big periods for us are really ahead of us, whether it is back-to-school or Memorial Day actually falls in our second quarter, and then of course holidays, a lot of that is ahead of us.

67.    A September 10, 2010 analyst report from Oppenheimer ("Oppenheimer

Report"), issued in advance of the Company's second quarter fiscal year 2011 ("2Q11")

financials, highlighted the current weakness in televisions and laptops and suggested that

based on these developments investors may be expecting a reduction in FY2011 guidance

from Best Buy (as opposed to an increase in earnings forecast).  The report stated, in

relevant:

> Data suggest that sales in the previously strong laptop category slowed while trends in the already weak TV segment stayed sluggish. . . .  The potential for a cut in management guidance seems well priced into shares. We remain concerned with the fundamental outlook for BBY, but believe, however, that shares are finding a bottom.

68.     The Oppenheimer Report included "Appendix A: Recent Company Comments Suggest Softer Trends in Flat Panel TVs and Laptop Computers," which included statements from Best Buy competitors, including Costco, indicating television sales continued to be soft.  Statements from Costco's representatives included:

> [July 2010:] "Majors, [Costco's] electronics department, experienced slight negative comp sales for July, primarily due to soft TV sales, although we did see a slight improvement in July, less negative compared to May and June. TV units and dollars were down about the same amounts in the July reporting period."

> [August 2010:] "Majors, our electronics department, experienced slightly negative comp sales for August, primarily due to soft TV sales. Negative mid-single-digit in both units and dollars for TV sales.

69.     The Oppenheimer Report also included "Appendix B: Sales Negatives Seem to Have Outweighed Sales Positives For BBY Over the Past Few Months," which stated:

| Negative Sales Drivers for BBY | Qualitative Commentary |
| --- | --- |
| Laptops | Sales trends are likely to decelerate sequentially as consumer demand for laptops has waned lately. |
| Slowing Unit Demand for TVs | Industry and competitor reports suggest a recent slowing in TV unit demand. |

70.     On September 14, 2010, Defendants caused the Company to issue its financial results for 2Q11 in a press release entitled "Best Buy's Second Quarter Diluted

EPS grows 62% year-over-year to $0.60." Defendants reported 2Q11 earnings of $254 million (an increase of 61% year-over-year) and EPS of $0.60 per share, $0.20 above Wall Street estimates of $0.40. The earnings results were a surprise to analysts and investors but these earnings were not the result of strong revenue growth in the quarter. In fact, sales and revenues grew less than 3% year-over-year. Instead, the earnings results appeared to be driven by high margins on wireless products, which comprised a small portion of the Company's overall sales, Defendants' employment of "levers" resulting in steeply lowered SG&A, a lower tax rate and share repurchases.

71.    In contrast to the blowout earnings results, Defendants caused the Company to report domestic comparable store sales declines of 1.4%, which was attributed primarily to a decline in customer traffic, comparable store sales in TVs and 50 basis point decline in market share. The Company was losing business to competitors like Target, Amazon, and Walmart and Defendants knew it. Because of the slowing sales, Defendants caused the Company to reduce its FY2011 revenue forecast by up to $1 billion, to $52 billion, from $52-$53 billion, yet increased its EPS forecast. Indeed, other weak indicators were drowned out by Defendants' false bullishness for earnings growth for the remainder of FY2011.

72.    Despite the sequential comparable store declines and the reduction in revenue forecast, Defendants, in the press release, aggressively and falsely (i) *increased FY2011 forecasted operating income growth from 30-40 basis points to 40-55 basis points, and* (ii) *increased its FY2011 earnings forecast from $3.45-$3.60 to $3.55-$3.70 per share*. Defendants' increased earnings forecast conveyed that the Company would

- 26 -

experience substantial and accelerated growth in the second half of FY2011, which would permit it to make its EPS guidance and reaffirmed defendants' message that the year was unfolding as planned:

> **Best Buy's Second Quarter Diluted EPS grows 62% year-over-year to $0.60**
>
> **Company significantly increased operating margin in the quarter. Company completed share repurchases totaling $700 million during the first fiscal half. Fiscal 2011 diluted EPS guidance increased to $3.55 to $3.70.**
>
> *   *   *
>
> The comparable store sales results were driven primarily by a decline in customer traffic, partially offset by an increase in average ticket. . . . [L]owdouble digit comparable store sales decline in TVs was driven by a low double-digit decline in unit sales and moderating price declines.
>
> *   *   *
>
> [D]omestic market share declined 50 basis points versus the comparable period last year for the three months ended July 2010. . . .  The company noted that it continues to expect to increase its market share for the full fiscal year.

73.    Defendants caused the Company to increase its FY2011 EPS forecast by $0.10 to $3.55-$3.70.  Defendants attributed the increase to the effects of its stock repurchases of $100 million in 1Q11 and $600 million in 2Q11, which reduced the outstanding number of shares and thus positively impacted earnings on a per-share basis. However, Defendants assured investors that the Company's revised FY2011 earnings forecast did not include the positive impact that would result from the further repurchase of millions of outstanding shares later in the fiscal year:

- Share repurchases totaled approximately $600 million in the second fiscal quarter (approximately $700 million in shares repurchased for the first fiscal half). . . .

- Fiscal 2011 diluted EPS guidance increased by 10 cents to $3.55 to $3.70 to reflect impact of share repurchases completed in the first fiscal half (the new guidance range excludes the impact of potential share repurchases that may be completed in the second fiscal half).

74.    On the same day, September 14, 2010, Defendants held a conference call for analysts and investors to discuss the 2Q11 financial results.  The call was hosted by defendants Dunn, Muehlbauer and Vitelli.  On the call, Defendants admitted that weak 2Q11 Company sales results were because of domestic comparable store sales declines in home theatre, entertainment, hardware and software, and slow customer traffic:

> [Muehlbauer:]  Overall, revenue grew 3% to $11.3 billion, on comparable store sales that were essentially flat versus last year. This revenue performance included domestic comparable store sales declines of 1.4%. This decline was driven primarily by softness in customer traffic patterns that resulted in lower sales across categories such as home theater, entertainment hardware, and software.

75.    Defendants stated that notwithstanding the sequential disappointing sales figures, sequential declining metrics in the key TV category, the Company's 2Q11 loss of market share, the reduction of FY2011 revenue guidance of $1 billion and the reduction in FY2011 comparable store growth guidance by 1%, the Company was nonetheless currently "*on track to deliver and exceed our annual EPS guidance*" *of $3.55-$3.70 per share, up to an 18% increase over FY 2009*.  In addition to the false statements that the Company would report FY2011 earnings between $3.55-$3.70 per share, the statement that the Company was on track to meet or exceed that EPS forecast was not forward looking but instead a material statement (false) of current fact.  Incredibly, in spite of a host of negative developments and declining indicators, defendants claimed that the fiscal year had thus far played out consistent with their expectations:

During the quarter, we bought back $600 million of stock, which brought our first half of the year repurchase total to more than $700 million. We continue to see buybacks and dividends as a good way to improve returns for shareholders, and intend to utilize this lever in the coming quarters as we go profitably.

\* \* \*

[Muehlbauer:] ***So looking at the results for the first half of fiscal 2011, [w]hile there are many moving pieces that we manage . . . we are pleased that our earnings are essentially in line with our original expectations for the year***, as strong gross profit rates and cost control plans work to offset softer top line growth. . . . our earnings are essentially in line with our original expectations for the year.

\* \* \*

First, looking at revenue, given the softness experienced year-to-date, we have lowered our revenue expectations to approximately $52 billion. As a result, we now anticipate comp store sales growth 1% to 2% for the full year . . . .

\* \* \*

[W]e now expect to deliver 40 to 55 basis points of operating income improvement versus last year. . . . ***In total, these assumptions along with the favorable impact of share repurchase activity completed in the first half, now lead us to an earnings per share guidance range for the year of $3.55 to $3.70, an increase of 13% to 18% versus last year, and $0.10 higher than our original range***.

\* \* \*

. . . ***Overall, we are pleased that we are on track to deliver and exceed our annual EPS guidance***.

76.    Defendants acknowledged that TV sales were down to that point in the year, and in fact the entire industry was down, but nonetheless stated that 3D gaming would drive both gaming sales and 3D TV sales, and thus drive third quarter 2011 ("3Q11") financial results:

[Dunn:] TV comps were down in the quarter. We had a difficult compare versus last year, and the overall industry was down. Despite the overall weakness in TVs, Magnolia which serves the premium customer segment, had a great quarter, showing there's a healthy demand for a premium home theater experience, an encouraging sign, and a good leading

indicator considering the innovations in home theater we see coming in the quarters ahead.

*   *   *

We expect 3D gaming will be a big driver for gaming sales, and in turn will stimulate 3D TV sales.

In TVs, we'll see continued LED growth, and growing momentum in 3D, IPTV, and Google TV.

*   *   *

[Analyst:] I was wondering if you could comment a little bit more on the market share decline of 50 basis points during the quarter, which is highly unusual for you guys. I guess, I was hoping if you could provide more color on how that trend will be reversed in the back half, particularly as we think about strong sales of iPad continuing and perhaps cannibalizing the overall PC category.

[Dunn:] We're happy – I think what I'll do is give you sort of a framing remark or two, and then I'll ask Mike to weigh in on our thoughts on that.

. . . [A]s I mentioned in my remarks, we see 3D gaming driving a bit more interest in 3D television. We see IPTV becoming more interesting in the second half of the year to the consumers. And I think the long and short of it is, I do believe the customer is not only episodic, I think the customer is turning his or her wallet to sort of a just in time need basis. And I think as we get into the back half of the year, over the last few years we've seen this trend accelerate, that the consumer is moving to CE and connected solutions, which is sort of right in our sweet spot.

77.    Defendants also specifically rejected analysts' concerns about growing inventory, which had continued to increase through 2Q11, in part due to poor TV sales. Again, Defendants downplayed the significance of the 2Q11 inventory growth and stated that they were "satisfied" with inventory levels.   Consistent with Defendants' ongoing denials that any negative indicator should be paid any attention, defendant Muehlbauer essentially told investors to ignore the inventory growth as not relevant:

[Muehlbauer:] From an inventory perspective, we finished the quarter with domestic inventory levels up approximately 6% on a

comparable store basis. This increase was slightly higher than what we had anticipated, and was driven by revenue softness we saw in categories such as televisions . . . . Looking ahead to the second half of the year, we are satisfied with the overall quality of this inventory, and the expected availability of product going into the holiday season.

\* \* \*

[L]ooking at inventory levels at the end of Q2, given the holiday season in front of us, not particularly instructive. I think as far as figuring out where the business is going to go, where the margin's going to go.

78.    During the call, analysts asked Defendants to elaborate on the basis of their belief that top-line revenue in the second half would significantly accelerate to support the Company's guidance (notwithstanding the revenue forecast reduction by up to $1 billion).  These inquiries were driven by the fact that the Company reported declines in nearly every purported growth category of its business, and a reduction of $1 billion in revenue for the back half of the year, and assurances that it was not counting additional share repurchases to support in the FY2011 earnings forecast.  In response, Defendants assured investors that customer demand for new products would drive revenue, particularly during the holiday season, because customers "over-index their wallet share into CE products," and thus, there was no reason that the calendar 2010 holiday season would be any different from the Company's calendar 2009 experience where it had defied the reported impact of a slowing economy.

79.    Defendants separately offered assurances that the Company would take steps to ensure product demand during the holiday season, explaining that while they knew that TV sales had been weak, promotions in the holiday season would unlock "a lot of pent-up demand":

[Analyst:] [T]he revenue guidance is lower than what you originally articulated, and now you're looking for comps in the second half to be 1% to 3% in the wake of significantly more difficult compares. Jim, could you maybe just elaborate a little bit more on why you think the revenue line specifically is going to accelerate to a pretty significant extent in the back half of the year and in particular the holiday season?

[Muehlbauer:] . . . As we look at the back half of the year . . . [w]e know during the holiday season that customers over-index their wallet share into CE products. We have no reason to believe this holiday season is going to be any different.

* * *

[Analyst:] Just quickly, I like Brian's term, the episodic sales trend. As you look at the TV category, a weaker spot in sales for you in the quarter. But you did call out some of the strength you're seeing in Magnolia. So I guess the question I have, as we went through the quarter, and we got closer to the traditionally stronger football season, and even maybe subsequent to the quarter's end, did you see an improving trend there in the TV category, particularly with some of the new technologies now in the stores?

[Vitelli:] Generally, not. Generally, the overall TV industry has been relatively flat. I think that's partially, as I said earlier, I think it's partially because the industry hasn't been very promotional in the first half.

As Jim mentioned, we believe, in fact, we know that it's going to get more exciting promotionally in home theater in the second half. I think there's been a lot of pent-up demand, both from a consumer point of view and from a manufacturer and retailer point of view, to get some exciting promotions going and I think we're going to see more of that in the second half.

80.    Evidencing Defendants' deliberate efforts to evade or discount questions, which sought to elicit Defendants' basis for the Company's FY2011 forecast, defendant Dunn also provided facts inconsistent with the Company's prior representation on June 30, 2010 regarding the impact of back-to-school shopping. Previously, Defendants had said this event would drive sales. Defendant Dunn said it did not and had not in the past:

[Analyst:] If I could ask one more follow-up, just as you guys have mentioned episodic traffic, could you comment on just how back-to-school trended for you? . . . [D]id you see sales pick up toward the end of the quarter, as a result of shoppers perhaps waiting to that season?

\* \* \*

[Dunn:] [T]o answer the question specifically, . . . about back-to-school, we did not see a huge spike with the back-to-school business and I would add, nor did we last year.

So thanks for the question.

81.     Defendant Dunn's response to the question, indicating that in the past, back-to-school was not an event that historically (at least not in FY2010) resulted in stronger sales was in sharp contrast to Deno's statement of June 30, 2010 at the Oppenheimer Conference that back-to-school was among the "episodic" sales events that was still "ahead of us," and which would drive customer traffic.

## 2.     Analysts and Investors Respond Favorably to Defendants' False Bullish Statements and the FY2011 Forecast, Despite Weak 2Q11 Sales Results; Share Price Rallies

82.     On September 14, 2010, Oppenheimer issued a report on the Company's 2Q11 surprise earnings results, specifically noting that notwithstanding the weak sales, management demonstrated the promised use of "levers" to generate earnings in spite of slow sales. Oppenheimer thus expressed confidence, as did defendants, that future EPS misses were not likely:

We expect the market to look quite favorably upon the much better-than-expected Q2 (Aug.) results and updated FY10 (Feb. 2011) guidance that Best Buy reported today. Q2 EPS of $0.60 easily topped a Street figure of $0.44. Sentiment toward BBY declined markedly over the past several weeks. With today's announcement, BBY demonstrated clearly that the company has the operating levers required to perform well even amidst ongoing weakness in key categories. BBY is by no means "out of the

- 33 -

woods." The threat of a substantial EPS miss later this year, however, is likely off the table.

83.    On September 15, 2010, BB&T issued a report on the Company's 2Q11 financial results, expressing its delight with the Company's increased FY2011 earnings forecast and confidence that consumer spending, specifically new gaming platforms, tablets and e-readers, would increase during the holiday season.  The report reiterated Defendants' false aggressive earnings forecast as follows:

- [D]iluted EPS jumped 62.2% to $0.60, beating our estimate and consensus by $0.14. Management increased its FY'10 EPS guidance to $3.55-$3.70 from $3.45-$3.60 . . .

* * *

- Management believes consumer spending on electronics will pick up in H2'10, driven by a higher allocation of holiday spending on electronics; increased iPad availability; new motion-based video gaming platforms; new product introductions in tablet computing; and increased sales of e-readers.

* * *

We were impressed by Best Buy's much better-than-expected Q2'10 earnings and FY'10 guidance raise, which reaffirms our positive long-term outlook on the company.

84.    On September 14, 2010, SunTrust issued a report stating that Best Buy made a credible case for increased results for the remainder of the fiscal year:

While topline trends were a little softer than expected during the quarter (and the share loss commentary a little unnerving), we think that the company made a credible case of why the sales picture should brighten in coming months (better TV assortment and promotions, smart phone demand, tablet/e-reader enthusiasm and better video game products).

**3.    At Least One Business Analyst Publicly and Contemporaneously Described Reasons Why Defendants' FY2011 Sales and EPS Forecast Was without Reasonable Basis and Was in Fact Unattainable Based Upon the Company's Historical Performance**

85.    On September 15, 2010, at least one writer published an article on *Seeking*

*Alpha* describing what he called defendant Dunn's "irrational exuberance" concerning the Company's performance forecast over the second half of the year. The author restated in large part what certain analysts had raised (in more polite form) during the quarterly conference calls. The author concluded that after reporting declines in most significant measurables relating to the Company's current performance and potential for predicted growth in the fiscal year, Dunn was likely "Writing a Check His Company Cannot Cash."

86.     Analyzing the Company's past performance back to 2002, the author illustrated that in order for Best Buy to reach its forecasts the Company would have to accelerate sales at a rate and volume that it had not done before and likely could not achieve in the remaining two quarters of the year:

> Best Buy CEO's Irrational Exuberance: Is His Mouth Writing a Check His Company Cannot Cash?
>
> Let's take a look at the following comments from Best Buy (BBY) CEO Brian Dunn on the quarterly conference calls for Q1 2010 and Q2 2010 . . . .
>
> On the Q1 2010 call on June 15, 2010, he said: "We experienced some variability in customer traffic in the US over the course of the last 3 months, which resulted in a slightly lower comp than we were expecting."
>
> On the Q2 2010 on September 14, 2010, he said: "Weaker industry sales than we expected. Now let's drill down into our US business for a minute. We estimate that our overall market share was down slightly in the second quarter."
>
> Here's where it gets interesting. BBY management wants investors to believe that comp store sales in 2H 2010 will increase +1% to +3%. They want investors to believe that as comparisons toughen in the second half of the year, 2-year comp store sales trend rates will dramatically improve (see graph below).



        This gets even more interesting in Q4 2010 when the company has
to lap an impressive +7.0% comp store sales gain that was reported in Q4
2009.

                                    *   *   *

        Sounds like wishful thinking for a company that has just reported
two straight fiscal quarters in which they've softer sales than they had
expected.

87.    The voice of the *Seeking Alpha* poster was no match for the intensity of

false positive statements of the Defendants, which were repeated by securities analysts.

Defendants convinced analysts and investors that rapid sales acceleration was coming in

the third and fourth quarter of fiscal year 2011 ("3Q11" and "4Q11," respectively) and

would fuel the Company's earnings, notwithstanding the weak 1Q11 and 2Q11 results.

After the Company's September 14, 2010 financial report and conference call, the

Company's stock price increased from a close of $34.65 per share on September 13, 2010

to a close of $36.73 per share on September 14, 2010.  By September 27, 2010, Best Buy

stock was trading above $40 per share.

88.    Each of the September 14, 2010 statements concerning the Company's current state of business were independently false and misleading, including: (i) *the forecasted FY2011 EPS of $3.50-$3.70*; (ii) *the statement that the Company was "on track to deliver or exceed annual EPS guidance" of up to $3.70 per share*; and (iii) *the statement that "our earnings are in line with our original expectations for the year."*

89.    The September 14, 2010 statement, that the Company was currently "on track to deliver and exceed our annual EPS guidance" was materially false and misleading.  Emphasizing the connection between its business experience during the first half of FY2011 and the new EPS forecast, during the September 14, 2010 conference call, Defendants sought to justify the Company's new increased EPS forecast of $3.50-$3.70 reported in a press release of the same day and repeated during the conference call, even in light of the $1 billion reduction in FY2011 forecasted revenue and known declining sales trends.  During the call, Defendants detailed the Company's historical performance to date, which included poor results in key performance metrics (comparative store sales, television sales, in-store traffic, etc.) and strong margins and gross profits reported in 2Q11, and the favorable impact of "share repurchase activity completed in the first half" of FY2011.  Defendants also specifically connected the historical business performance, including 2Q11 results and the new EPS forecast of $3.50-$3.70.  According to Defendants, taking into account the Company's first half FY2011 performance, Best Buy was well-positioned and indeed "*on track to deliver and exceed*" its new increased EPS forecast of $3.50 to $3.70 per share.

[Dunn:] We estimate that our overall market share was down slightly in the

second quarter. . . .

&#42;   &#42;   &#42;

TV comps were down in the quarter. We had a difficult compare versus last year, and the overall industry was down.

[Muehlbauer:] This revenue performance included domestic comparable store sales declines of 1.4%. This decline was driven primarily by softness in customer traffic patterns . . . .

The big headline for the quarter was the significant improvement in gross profit rate.

&#42;   &#42;   &#42;

From an inventory perspective, we finished the quarter with domestic inventory levels up approximately 6% on a comparable store basis. This increase was slightly higher than what we had anticipated, and was driven by revenue softness we saw in categories such as televisions . . . .

&#42;   &#42;   &#42;

So looking at the results for the first half of fiscal 2011, while there are many moving pieces that we manage, like always, ***we are pleased that our earnings are essentially in line with our original expectations for the year***, as strong gross profit rates and cost control plans work to offset softer top line growth, particularly in the domestic business. . . . We believe the first half performance has us well positioned to deliver on our full year financial guidance.

&#42;   &#42;   &#42;

First, looking at revenue, given the softness experienced year-to-date, we have lowered our revenue expectations to approximately $52 billion. As a result, we now anticipate comp store sales growth of 1% to 2% for the full year, which translates to a comparable store sales estimate of up 1% to 3% for the back half of the fiscal year.

&#42;   &#42;   &#42;

Bringing these assumptions together, we now expect to deliver 40 to 55 basis points of operating income improvement versus last year. Embedded in this estimate is the projection that the domestic business will come in at the top end of that range. In total, these assumptions, along with the favorable impact of share repurchase activity completed in the first half, now lead us to an earnings per share guidance range for the year of $3.55 to $3.70, an increase of 13% to 18% versus last year, and $0.10 higher than our original range.

As you can see, ***we are essentially maintaining the operating expectations from our original guidance range, and just updating the***

- 38 -

*impact of share repurchases made fiscal year-to-date. Overall, we are pleased that we are on track to deliver and exceed our annual EPS guidance.*

90.    However, as of September 14, 2010, Defendants knew of the following facts, each of which independently and together, unequivocally indicated that: (i) the Company was not currently "on track" to make and beat the new EPS forecast; and (ii) forecasted sales and earnings results of $3.55-$3.70 were made without a reasonable basis and were unattainable:

(a)    Best Buy's comparable store sales had to that point in FY2011 been well below expectations, reporting 2.8% growth in 1Q11 compared to expectations of 4%-5% growth and a 1.4% decline in 2Q11.

(b)    Best Buy's in-store traffic to that point in FY2011 had been declining, resulting in comparable store sales declines. ("[W]e saw slight comparable-store sales declines in some of our categories"); ("[C]omparable store sales results were driven primarily by a decline in customer traffic").

(c)    Best Buy's comparable store sales of televisions to that point in FY2011 had been declining. (Best Buy "experienced a low-single digit comparable store sales decline in televisions during 1Q11"); (Best Buy experienced "low double-digit . . . decline in TVs" during 2Q11).

(d)    Best Buy's comparable store sales of gaming products to that point in FY2011 had been declining. (1Q11 sales increases "were partially offset by comparable store sales decreases in gaming, music and movies").

- 39 -

(e)    Best Buy's inventories to that point in FY2011 were growing because of slow sales. ("we finished the quarter with domestic inventory levels up approximately 6% . . . driven by revenue softness we saw in categories such as televisions").

(f)    Revenue growth to that point had underperformed in both 1Q11 and 2Q11.

(g)    Defendants also knew that as of September 14, 2010, in order to reach forecasted annual revenue and earnings forecast, the Company would have to achieve dramatically accelerated sales growth, which would require the Company to lap the prior year comparable store sales improvement of up to 7%, which was sharply inconsistent with the Company's past performance.  In fact, Defendants knew and publicly acknowledged that after the June 15, 2010 report of both revenue and earnings misses for 1Q11, that in order to meet original and lower FY2011 revenue and earnings forecast, the Company "would have to exceed your original expectations in the remaining quarters."

91.    In reality, under Defendants' direction and on their watch, Best Buy was not "on track," but instead was far off pace to achieve, much less exceed, its FY2011 targets as it represented.

92.    For the same reasons stated above, and the reasons set forth below, Defendants' September 14, 2010 statements that the Company would earn $3.55-$3.70 per share in FY2011 were false and misleading when made.  Defendants would later admit on December 14, 2010 that the forecasts issued "earlier in the year" and their

underlying assumptions were false (though choosing instead to say "too aggressive"). It was the false financial forecast as opposed to changes in economic conditions or consumer taste that caused the 3Q11 miss and the December 14, 2010 reduction in FY2011 forecasts.

93.     Finally, the Company's reported earnings results (which were reported under Defendants' direction and on their watch) for the first half that were not "essentially in line with original expectations for the year." Rather, it was only through manipulation of SG&A costs, and "moving pieces that [the Company] manage[d]" that Best Buy was able to report 2Q11 earnings above analysts' estimates, after reporting 1Q11 earnings results that were $0.14 below estimates.

94.     Defendants admittedly manipulated "levers" to report positive near term (2Q11) earnings despite known 2Q11 declines in same-store sales, in- store traffic, TV sales, the first market share decline in 18 quarters and a $1 billion reduction in FY2011 revenue forecasts. The Company's original earnings expectations *for the year*, which were set on March 25, 2010 would not have required earnings management to report positive 2Q11 EPS. These manufactured 2Q11 EPS results were to the detriment of original EPS expectations *for the year*, which Defendants had defiantly reaffirmed on June 15, 2010. This independently false statement of current business condition, in combination with the false claim that notwithstanding all of these known factors the Company was "on track to deliver and exceed" its newly increased FY2011 EPS guidance, set knowingly false market expectations, which resulted in artificially inflated stock prices.

C.    **The Truth Begins To Emerge**

   1.    **Defendants Disregarded Facts Which Rendered the Company's FY2011 Financial Forecasts without Reasonable Basis and Unattainable**

95.    At the time of the September 14, 2010 false statements, it was true that under Defendants' direction and on their watch, certain significant business performance metrics had been flat or declining well before the Relevant Period, some as early as June 15, 2010:

   (a)    Gains in mobile phones, notebooks and appliances sales "were partially offset by comparable store sales decreases in gaming, music and movies."

   (b)    TV sales trends had decelerated, and according to Defendants in 2Q11, "the industry itself kind of pulled back."

   (c)    "[W]e saw slight comparable-store sales declines in some of our categories, like gaming and home theatre."

96.    As of September 14, 2010, Defendants had admitted that their knowledge of the fact that traffic in the Company's domestic big box stores had been flat or declining:

   (a)    "Our traffic's been choppy month by month."

   (b)    "Comparable store sales results [in 2Q11] were driven primarily by a decline in customer traffic."

   (c)    [C]omparable store sales declines of 1.4% . . .driven primarily by softness in customer traffic patterns."

97.    As of September 14, 2010, under Defendants' direction and on their watch,

sales of gaming products had been either flat or declining well before and during the Relevant Period, as early as June 15, 2010:

(a)      Gains in mobile phones, notebooks and appliances sales were "partially offset by comparable store sales decreases in gaming, music and movies."

(b)      "[W]e saw slight comparable-store sales declines in some of our categories, like gaming."

98.      As of September 14, 2010, under Defendants' direction and on their watch, TV sales had been flat or declining as early as June 15, 2010, and that as of September 2010, "the overall TV industry has been relatively flat."  Moreover, the analog to digital conversion, which helped the Company report strong results in FY2010, would not be repeated in FY2011:

(c)      "The Company also noted that it experienced a low-single digit comparable store sales decline in televisions."

(d)      "This [inventory] increase was slightly higher than what we had anticipated, and was driven by revenue softness, we saw in categories such as televisions."

(e)      "[T]he low-double digit comparable store sales decline in TVs was driven by a low double-digit decline in unit sales."

(f)      "TVs comps were down in the quarter, we had a difficult compare versus last year."

(g)      "Generally, the overall TV industry has been relatively flat."

99.      As of September 14, 2010, Defendants knew that in 2Q11 the Company

had experienced a market share decline of 50 basis points.  In fact, it was reportedly the first time in 18 quarters that Best Buy had experienced such market share declines: "Domestic market share declined 50 basis points versus the comparable" period last year.

100.   As of September 14, 2010, Defendants actually knew and admitted their knowledge that, as of 2Q11, the Company's inventories had increased sequentially and publicly attributed the inventory increases to sales and revenue softness ("From an inventory perspective, we finished the quarter with domestic inventory levels up approximately 6% . . . [t]his increase was slightly higher than what we had anticipated, and was driven by revenue softness.").

101.   As of September 14, 2010, Defendants actually knew or recklessly disregarded that two of its top television vendors, Panasonic and Sony, had indicated publicly that they did not expect U.S. TV sales to recover in 2010.  A September 14, 2010 article published in *The Wall Street Journal* ("*WSJ*") entitled "Retailers Turn to Gadgets – Best Buy, Others Stock Up on Handhelds for Holidays as TVs, PCs Lose Luster," noted that in August 2010, Yoshiiku Miyata, a Panasonic executive, was interviewed by *WSJ*.  Panasonic had recently launched its Panasonic Viera 3D TV at Best Buy stores; Miyata stated that "there is definitely a slowdown in U.S. sales."  The same article stated that Yoshihisa Ishida, head of Sony TV, no longer expected to make U.S. sales targets.[4]

102.   Defendants' acknowledged manipulation of the "levers" of SG&A in order

---

[4] As of December 1, 2010, Best Buy's website showed the Company having 35 different models of Panasonic TVs and 24 different models of Sony TVs.

to sharply reduce SG&A in 2Q11, a period of declining sales, weak revenue and growing inventories was a tacit admission of knowledge of the slowdown and expectation that it may continue.  On June 15, 2010, Defendants told analysts that "if things slow down," the Company would "pull down the SG&A significantly."

103.    All of these facts, taken together, demonstrate that Defendants' statements made on September 14, 2010 were made without reasonable basis and were unattainable. Additionally, Defendants were already attempting to mask the slowdown in business performance by causing the Company to aggressively buy up hundreds of millions of dollars of Best Buy shares in the open market, thereby increasing per share earnings price.

104.    On September 28, 2010, *MarketWatch* published an article discussing comments made by defendant Dunn at an event in New York City indicating that Best Buy's competitive pricing is the factor that shifts sales in its favor as compared to competitors and that come Black Friday, the Company would be offering "smoking-hot deals":

> "Consumer spending is episodic. This is not an environment to scream out sales when people are still not interested (to buy)[.] Business is going to be hard-fought. Come Black Friday, you'll see smoking-hot deals."
>
> *   *   *
>
> On the pricing front, executives declined to give more detail, except to say promotions will be just as intense as prior years and more marketing and product based.
>
> "We are there on price," Dunn said. Those "differentiated factors are tie breakers for us."

105.    On or around November 16, 2010, defendant Dunn attended the Intel

Capital CEO Summit in Huntington Beach, California.  As reported by *Reuters* and RBC

Capital Markets ("RBC") on November 16, 2010 and November 17, 2010, respectively,

Dunn stated that holiday shoppers may be waiting until the holidays to make purchases.

This was a tacit admission that, to date, Best Buy's sales had continued the known

declining trends throughout the summer and into September 2010 and that Defendants

were banking – without reasonable basis – that last minute holiday sales would allow the

Company to achieve or beat what they knew to be a wildly unreasonable and unattainable

aggressive FY2011 financial forecast.  The November 16, 2010 *Reuters* article stated, in

relevant part:

**Best Buy says holiday shoppers may buy at last minute**

> HUNTINGTON BEACH, Calif. Nov 16 Reuters – Consumers might delay this year's holiday shopping until the last minute because of the sluggish economy, the head of consumer electronics retailer Best Buy Co Inc (BBY) said.

> Brian Dunn, the chief executive officer of Best Buy . . . .

> "I think it's (holiday spending) going to be exciting, but I think it will be late this year," Dunn told Reuters on the sidelines of an Intel Corp (INTC) investor event.

> He said the slow economy was still affecting consumers.

> "I think people will sort of take a just-in-time approach to it," he said on Tuesday.

106.   On November 17, 2010, RBC issued the following report regarding

defendant Dunn's statements that consumers seemed to be waiting until the last minute to

do their holiday shopping.  While the disclosure offered a clue into what Dunn knew

about the Company's sales progress to that point, which had not changed since the

summer of 2010, RBC echoed the Company's line, which was that everything was still

going as planned and not to read anything into such negative indicators:

> *Best Buy CEO Sees Holiday Shopping Delayed to the Last Minute*

> Best Buy CEO Brian Dunn commented yesterday at an Intel investor event that, "Consumers might delay this year's holiday shopping until the last minute because of the sluggish economy."

> \* \* \*

> Net/net – We wouldn't read too much into Mr. Dunn's comments since they are very consistent with our current outlook on Best Buy's business.

**2.    As the Thanksgiving Holiday Approached, Defendants Increased the Intensity of Their Statements Concerning Demand for Their Products, Sending Share Prices Even Higher**

107.    On November 24, 2010, leading into the Thanksgiving holiday, defendant

Vitelli was interviewed by Neil Cavuto ("Cavuto") of Fox News Network.  The contents

of the television interview were repeated by news organizations, in analyst reports, and

on Internet sites and, as a result, became widely available to investors and reflected in the

market price for Best Buy stock.  In response to a direct question about how flat screen

TV sales were progressing, Vitelli falsely stated that Best Buy stores and, more

importantly, that flat screen television sales, were "going really strong" at both the high-

end and entry levels:

> [Cavuto]: ***How are flat-screens doing?***

> [Vitelli]: ***Flat-screens are doing well at different levels. . . .  We are doing really well at Magnolia at the high end with 3-D. And the entry-level pieces are going really strong.***

108.    Defendant Vitelli's comments on November 24, 2010 in response to

Cavuto's question regarding the status of flat screen sales was knowingly false and

misleading and continued to fuel the artificially inflated stock price.

109.    As admitted by Defendants during December 14, 2010 earnings conference call, at the time of the representations on November 24, sales of flat screen TVs were not "doing well" nor were "entry-level pieces . . . going really strong."  As would be reported only two weeks later, the Company experienced double-digit declines in TV sales for 3Q11.  On December 14, 2010, defendant Vitelli admitted that the Company had in fact seen declines in flat screen entry-level televisions in November 2010.

> [Analyst:] So [sales declines] it's mostly in TVs, is what you're saying, or all in TVs?
>
> *   *   *
>
> [Vitelli:] It's a little bit in television and a little bit in computing. . . . So that's why it's TV and computing, is the big story, or the big difference.
>
> . . .[L]ast year . . . [w]e had record high shares in all of those areas. So we knew that we were going to get some of that decline coming off. We saw a little bit there. And as Brian said, a little bit in entry-level television and in entry-level computing in November . . . .

110.    As discussed above, Defendants admitted their knowledge of facts that were in sharp contrast to their false positive statements on September 14, 2010 and November 24, 2010.  The known and admitted declining business trends, particularly in TVs, had not recovered but instead appeared to accelerate leading up to and through Black Friday.

111.    In another interview on November 26, 2010 with *Bloomberg's* Erik Schatzker's Inside Track, defendant Dunn stated that based on the activity he had seen thus far at Best Buy stores, "people are absolutely spending money.  The registers have been going nonstop since we opened the doors."  Dunn went further, describing strong

sales activity in the key products, including games like the new Microsoft Kinect, netbooks, notebook computers and tablets.  Each of these products had been previously predicted by defendants to be the drivers of FY2011 revenue and earnings growth, which would allow the Company to meet its annual guidance through accelerated growth in the back half of the year.

BRIAN DUNN, CHIEF EXECUTIVE OFFICER OF BEST BUY, TALKS ABOUT BLACK FRIDAY ON BLOOMBERG NEWS

NOVEMBER 26, 2010

[Schatzker:] CEO Brian Dunn is at one of his stores at Eden Prairie, Minnesota. Brian . . . talk to us about some of the anecdotal evidence you're seeing for Black Friday demand right now.

[Dunn:] What we're seeing so far, anecdotally of course, is we're estimating about an 8 percent increase in our traffic year over year. . . . The crowds are terrific.

[Schatzker:] Okay. Eight percent in terms of traffic. How about 8 percent in terms of sales? Can you - is it - is there a direct relationship between the two or are people spending money?

[Dunn:] Yeah, I'm not calling for any direct correlation there. But people are absolutely spending money. The registers have been going nonstop since we opened the doors. . . .

[Schatzker:] Now, what are some of your top sellers? You have a few doorbusters like the $400 32-inch Samsung flat panel TV. What is it that people seem to be buying the most of?

[Dunn:] Our Best Buy Mobile, our smartphone business, is really hot this morning. Our gaming section is very, very hot with the new Microsoft Kinect and the Sony Move platform gaming. And we're also seeing an awful lot of action in computing with both our tablets and netbook, notebook computer.

112.    On November 26, 2010, in a separate interview, Dow Jones reported that

defendant Vitelli stated that current demand was "very brisk," including for new motion-based games like Microsoft's Kinect:

> Business is "very brisk" at Best Buy, and demand is broad, said Michael Vitelli, president of the company's Americas division. Among the popular items are e-readers, tablet computers and motion games like Microsoft's (MSFT) Xbox Kinect.

113.   On November 26, 2010, CBS interviewed defendant Dunn regarding the perspective on how Black Friday was unfolding.   One interviewer asked about the Company's smartphone business, Best Buy Mobile, and whether Best Buy Mobile plays a part in growth for the future and particularly for Christmas, which was just over three weeks away.   Dunn explained "yeah it does" play a part in Christmas and the business helps the Company access new customers.[5]

114.   On and after November 26, 2010, Best Buy stock continued to trade at levels above $42 per share as a result of the false and misleading statements, leaving investors with the impression that Black Friday was materializing into strong sales for investors.

_____

[5] On December 14, 2010, Defendants caused the Company to report strong results in its smartphone business, Best Buy Mobile, including low double-digit same store sale increases margin expansion benefitting from Best Buy mobile sales (a trend that had continued since at least 2Q11).   It is thus even more remarkable that the Company preannounced 4Q11 and FY 2011, slashing revenues and earning forecasts three weeks before Christmas.   Defendants' abandonment of the Company's admittedly overly aggressive forecast weeks before the holiday events (Christmas in the United States, Europe and Canada) and notwithstanding upwardly trending growth, in its high sales, high margin, Best Buy Mobile unit is further evidence that the financial forecasts made earlier in the year were wildly and recklessly out of line with any reasonable outlook for FY 2011.

- 50 -

**3.    Defendants Cause Best Buy to Miss 3Q11 Earnings Expectations; Slash Recently Raised Earnings Forecast for FY2011 by $0.50 per Share Before the Holiday Events; Stock Price Collapses**

115.    On December 14, 2010, Defendants caused the Company to report its 3Q11 financial results in a press release.  Once again, the Company missed Wall Street analyst revenue and earnings expectations by a wide margin.  As opposed to the estimated $0.61 EPS, Defendants reported just $0.54 EPS.  Domestic comparable store sales declined an enormous 5%, and the Company lost 110 basis points of market share and expected to lose more.  Defendants disclosed that the declines were driven primarily by weak sales in TVs and gaming software, which Defendants maintained as late as November 26, 2010, were doing very well, with strong sales in both categories.

116.    What was more remarkable, however, was the fact that Defendants slashed the FY2011 financial forecast only two weeks into 4Q11 and before the holiday events, *i.e.*, Christmas in the United States, Europe and Canada), which they had promised would drive sales and allow the Company to meet annual guidance.  The timing of the sharp reduction in FY2011 earnings was further evidence that the forecast, when made, was materially false and misleading and defendants knew it.  Notwithstanding the fact that Defendants just increased FY2011 forecast on September 14, 2010, Defendants caused the Company to drastically cut its FY2011 earnings forecast by up to $0.50 to $3.20-$3.40 per share from $3.55-$3.70 – well below even the initial earnings forecasts of $3.45-$3.60 per share set in March 2010.  The December 14, 2010 press release stated, in relevant part:

**Fiscal Third Quarter 2011 Summary:**

- 51 -

- Domestic segment's comparable store sales declined 5.0% . . . .

                               *   *   *

- Updated diluted EPS guidance range for fiscal 2011 of $3.20 to $3.40 (previous guidance range was $3.55 to $3.70), driven primarily by lower domestic revenue expectations partially offset by continued improved gross margin rates and control over variable expenses.

                               *   *   *

**Best Buy Reports Fiscal Third Quarter Diluted EPS of $0.54**

*Best Buy Co., Inc. (NYSE:BBY), the world's leading retailer of consumer electronics, today reported net earnings of $217 million, or $0.54 per diluted share, for its fiscal third quarter ended November 27, 2010, compared with $227 million, or $0.53 per diluted share, for the prior-year period.* "I am grateful for the hard work and dedication of our employees in the start of the holiday shopping season," said Brian Dunn, CEO of Best Buy. "While sales were lower than we expected during the quarter, I'm pleased with our strong store execution, solid gross margin expansion and efforts to control costs. I'm confident that our employees will continue to deliver great experiences that help our customers select the best gifts for their friends and family this holiday season."

                               *   *   *

*During the third quarter of fiscal 2011, the company repurchased approximately $420 million, or 11 million shares of its common stock at an average price of $38.69 per share. For the first nine months of fiscal 2011, the company repurchased approximately $1.1 billion, or 31 million shares of its common stock at an average price of $36.68 per share. The company estimates that the share repurchase completed fiscal year-to-date had an approximately $0.03 favorable impact to the fiscal third quarter's diluted EPS.*

The company also noted that it has $1.4 billion remaining capacity under its existing share repurchase authorization as of the end of the fiscal third quarter. On October 5th, 2010, the company paid a dividend of $0.15 per common share, or $60 million in the aggregate.

**Fiscal 2011 Guidance**

"Fiscal third quarter domestic sales were softer than we expected, but we were very pleased with the continued strong gross margin performance and actions to lower variable expenses," said Jim Muehlbauer, Best Buy's

executive vice president of finance and CFO. ***"Based on lower than expected sales and earnings in the fiscal third quarter, and given our current visibility to potential outcomes in the fiscal fourth quarter, we now expect annual earnings to be below our previous fiscal 2011 EPS guidance. There remains a significant amount of business still ahead of us in the holiday selling season and we don't have complete visibility to how customers will behave over the next several weeks. However, our best view today is that we now expect annual EPS in the range of $3.20 to $3.40."*** The company noted that this new guidance range includes the favorable impact of share repurchases made year-to-date through the end of the fiscal third quarter which approximates $0.12.

**4.    Defendants Admit What They Knew Months Earlier but Had Repeatedly Denied: Revenue and Sales Forecasts and Assumptions Were Too Aggressive, *i.e.*, False, When They Were Made**

117.    On December 14, 2010, Defendants held a conference call for analysts and investors. The call was hosted by defendants Dunn, Muehlbauer and Vitelli. Defendants attempted to explain the earnings miss and the reduction in the FY2011 earnings forecast as resulting from slow sales across the board, including those products defendants claimed would drive in store traffic. In addition, Defendants admitted that it was not a slowing economy, or changed investor expectations, but instead an overly aggressive forecast, and underlying assumptions ("top-line growth assumptions earlier in the year turned out to be too aggressive" based upon the demand environment), which ultimately caused the 3Q11 revenue and earnings miss and December 14 reduction in guidance:

> [Dunn:] Our sales in the US, however, were lower than we expected for the quarter. And as a result, earnings were less than we anticipated. . . .

> . . . Our forecast and the forecasts of the vendor community were looking for an improvement in the TV industry in the third quarter, supported by a more promotional environment and pent-up consumer demand for new technologies.

CASE 0:15-cv-02664-DWF-SER    Doc. 1    Filed 06/05/15    Page 54 of 80

. . . In fact, estimates show the TV market was down double digits in value terms in the third quarter. We think this was driven by a weaker overall demand environment for TV, along with slower adoption of new technologies.[6]

\* \* \*

. . . The newer technologies, like 3D and IPTV . . . have been slower to take hold. . . .

. . . The notebook market was weaker than we expected . . . . The gaming sector lagged our expectations.

\* \* \*

[Muehlbauer:] As you noticed in our release this morning, the single largest driver of our softer-than-expected performance in the quarter was the comparable store sales decline in the domestic segment.

\* \* \*

[O]ur top line growth assumptions earlier in the year turned out to be too aggressive based on the environment that we see for demand, specifically in the TV industry, and the computing industry overall.

118.    Defendants also admitted that Best Buy's poor 3Q11 performance was due in part to a failure to be sufficiently promotional – which they promised to be before Black Friday and falsely confirmed that they were on Black Friday.  Indeed, Defendants had maintained that they "knew" they would be highly promotional and would provide "smoking-hot" deals that would fuel their FY2011 results and they knew what competitors were doing:

[Dunn:] [T]here was an awful lot of activity at opening price points, particularly in home theater, and this was primarily at some of the large discounters. And this was a space, as you well know, our strategy is really focused on great name brands, the big sort of tier-one, tier-two name brands, and great prices. There was an awful lot of activity at the sort of tier-three brands at opening price points, and candidly, that was a place we elected not to chase.

---

[6] The comment, that the "vendor community" expected sales improvement in the third quarter, appeared inaccurate as well.  Compare reported comments from Sony and Panasonic heads who each noted that they did not expect sales improvement or meeting sales targets.

- 54 -

[Analyst:] So it's mostly in TVs, is what you're saying, or all in TVs?

* * *

[Vitelli:] It's a little bit in television and a little bit in computing. . . . So that's why it's TV and computing, is the big story, or the big difference.

. . .[Last year] [W]e had record high shares in all of those areas. So we knew that we were going to get some of that decline coming off. We saw a little bit there. And as Brian said, a little bit in entry-level television and in entry-level computing in November, where we have that promotion going on more actively in December. So in the 32-inch television, we did that a lot last year around the Black Friday time period. This year, we didn't do it then. We're doing our – a lot of our 32-inch television promotions right now.

* * *

[Analyst:] I was hoping you could talk a little bit just on your philosophy around opening price point products. Last year you really chose to participate on the computing and TV category. Sounds like you pulled back a little bit this year relative to last. . . .

* * *

[Dunn:] . . . [W]e were not focused on that opening price point. We certainly had the opening price point represented in our store, and we'll continue to have that kind of value represented in our store. We chose not to lead with it.

119.    Defendants additionally noted that in 3Q11 the Company had repurchased yet another 11 million shares of its stock at a cost of $420 million, bringing the total for the first three quarters of FY2011 to 31 million shares:

Share repurchases totaled $420 million in the fiscal third quarter (approximately $1.1 billion in shares repurchased fiscal year-to-date).

120.    In addition, Defendants stated that the new lower FY2011 earnings expectations of $3.20-$3.40 per share included the positive impact of the share repurchases of $0.12 on fiscal year earnings estimates.  Thus, but for 31 million shares repurchased in the first three quarters of FY2011, earnings expectations could be as low

as $3.08 per share, $0.62 per share lower than Defendants' September 14, 2010 forecast.

121.  On this news, the Company's stock price fell 14%, from a closing price of $41.70 per share on December 13, 2010 to $35.52 per share on December 14, 2010.

122.  In contrast to the dismal sales and financial report from Best Buy, on December 14, 2010, the U.S. Commerce Department reported 0.8% increase in U.S. retail sales, which eclipsed economists' expectations of 0.5%.  In fact, on December 14, 2010, the Dow Industrial Average closed up 48 points or 0.4% ($11,476.54), which was the highest close since September 2008.  In addition, while the Company reported that entertainment hardware and software sales had declined, this was a Company-specific decline; the entertainment and software industry was reportedly up for the quarter ended October 30, 2010.[7]

123.  After the December 14, 2010 announcement, securities analysts opined that the Company's earnings miss damaged Defendants' credibility and was particularly confounding in light of the Defendants' September 14, 2010 earnings forecast increase and the positive statements made around Black Friday.

124.  On December 14, 2010, after Defendants caused the Company to issue its 3Q11 results, Wedbush issued a report discussing the disappointing financial disclosures. The Wedbush report specifically noted that the missed forecasted revenue and earnings estimates were in contrast to positive comments made by defendants about Black Friday results.  Thus, it appeared that in truth, the Company's Black Friday results were disappointing and Defendants' prior representations were false and misleading:

[7] Credit Suisse, "Living With A Bipolar Retailer," Dec. 15, 2010.

**Best Buy (BBY) Market Share Losses and Weak Demand Drive Poor Q3 Results: TV, Computer, and Game Sales Plummet, Growing Mobile Not Enough to Offset; Lowering Estimates and Price Target**

Q3 much worse than expected due to domestic demand weakness and market share losses. . . . EPS was $0.54, compared with our estimate of $0.61, and consensus of $0.60. The company lost 110 basis points of domestic market share in Q3 due to declines in TVs, mobile computing, and gaming software.

Disappointing comps across most revenue categories.

\* \* \*

The company lowered FY:11 EPS guidance EPS to $3.20-3.40 from $3.55 3.70, implying Q4 EPS guidance of $1.70-1.90.
Best Buy raised FY EPS guidance just last quarter, and today lowered it below the prior level.

\* \* \*

Despite prior comments to the contrary by Best Buy's CEO and indications from our own channel checks, today's results suggest Best Buy had a disappointing Black Friday.

125.   On December 15, 2010, BB&T issued a report discussing the Company's earnings miss and FY2011 drastic forecast reduction.  The BB&T report particularly questioned why Company executives, knowing in 2Q11 that television and PC sales were slowing, decided to raise the fiscal year earnings forecast when they had a "free pass" to lower guidance after a weak 2Q11.  The miss further damaged defendants' credibility with investors, one report said:

**BBY: NOT MUCH TO LIKE ABOUT Q3 "MISS AND LOWER."**

- **Best Buy reports worse-than-expected Q3'10 results, lowers FY'10 guidance.**  Revenue declined 1.1% to $11.9B and diluted EPS increased 1.9% to $0.54, missing our estimate and consensus by $0.10 and $0.07, respectively. Management lowered its FY'10 EPS guidance to $3.20–$3.40 from $3.55– $3.70.

\* \* \*

- 57 -

- **Q3 "miss and lower" surprising given recent guidance raise.** We believe Best Buy's earnings miss and guidance reduction were all the more disappointing given the fact management had a "free pass" to reduce guidance going into the Q2 earnings release amid widespread reports of slowing television and PC sales, and instead raised its FY'10 forecast.

\* \* \*

*In addition, Q3 marks the second time this year Best Buy has come up short of consensus estimates and is the latest of a number of earnings misses over the last few years.  We believe these periodic earnings disappointments negatively impact management's credibility with investors . . . .*

126.   A December 15, 2010 analyst report from Credit Suisse described investors' "anger" after Defendants disclosed that Best Buy was not as promotionally aggressive as they had represented during the Relevant Period that they would be:

Before looking forward, one more comment. *Much of the anger we witnessed yesterday was directed at management with the argument that they should have been more conservative or done a better job of letting investors know that they will be pulling back in their intensity in Q3 and moving some of that into Q4.*

127.   By December 15, 2010, the Company's stock price had declined to $34.82, down sharply from its Relevant Period high of $45.63, or 24%.

128.   On January 7, 2011, Defendants caused the Company to report its December 2010 sales results in a press release.  Defendants confirmed the reports of disappointing results: comparable store sales declined 5.0% compared to gains of 9.3% the prior year, entertainment software comparable store sales declined 15.4%, consumer electronics lost 7.9%:

Best Buy Reports December Revenue of $8.4 Billion

Company continues to expect fiscal 2011 fully diluted earnings per share of $3.20 - $3.40

\* \* \*

December Highlights

Domestic segment's comparable store sales declined 5.0 percent compared to a strong 9.3 percent comparable store sales growth in the same period last year. Domestic segment's results driven by softness in entertainment software and televisions . . . .

\* \* \*

In the Domestic segment, the entertainment software category comparable store sales declined 15.4 percent driven primarily by a decrease in gaming and continued softness in music and movies.

The consumer electronics category posted a 7.9 percent comparable store sales decrease due primarily to a low double-digit decline in televisions as the industry continued to experience softness.

129.    On March 24, 2011, Defendants caused the Company to issue a press release containing its financial statements and results for 4Q11 and FY2011.  The Company's press release included disclosures regarding the continuing declines in key measuring metrics such as revenue, earnings and comparable store sales.  EPS came in at an abysmal $3.08 per diluted share or $3.43 on an adjusted basis.  In addition, Defendants disclosed that in total, the Company repurchased 33 million shares of its common stock during the fiscal year at an average price of $36.62 per share.

Fiscal Fourth Quarter 2011 Highlights:

- Significant increase in connections transactions, driven primarily by continued growth in Best Buy Mobile.

\* \* \*

Fiscal Full Year 2011 Highlights:

- Revenue grew 1 percent year-over-year . . . .

- Significant gross profit rate expansion of 60 basis points year-over-year (70 basis points on an adjusted basis), which includes the Domestic segment's gross profit rate expansion of 90 basis points year-over-year.

* * *

- Net earnings of $3.08 per diluted share versus net earnings per diluted share of $3.10 in fiscal 2010.

- Adjusted net earnings of $3.43 per diluted share, a 9 percent increase year-over-year, versus adjusted net earnings per diluted share of $3.15 in fiscal 2010.

- Company repurchased $1.2 billion, or 33 million shares of its common stock during the fiscal year which represents approximately 8 percent of the company's outstanding stock at the beginning of the fiscal year.

* * *

The company reported that it recorded pre-tax restructuring charges totaling $222 million in its fiscal fourth quarter. These charges are consistent with the company's previously announced plans to restructure its international operations in order to enhance returns and to drive supply chain efficiencies in its Domestic segment. . . .

* * *

Overall demand for key consumer electronics products was a challenge for the industry last year," said Brian Dunn, CEO of Best Buy....

Continued Revenue Growth in Key Connectivity Categories

During the fourth quarter of fiscal 2011, Best Buy's revenue decreased 2 percent to $16.3 billion, compared with revenue of $16.6 billion for the fourth quarter of fiscal 2010. The decrease reflected a 4.6 percent decline in comparable store sales . . . . The Domestic segment experienced a low double-digit decline in entertainment hardware and software, as well as TVs, as current consumer demand in new television technologies had not yet emerged as a significant revenue driver. The Domestic segment also experienced a mid single-digit comparable store sales decline in mobile computing . . . .

* * *

Stock Repurchases Total $1.2 Billion for Fiscal 2011

During the fourth quarter of fiscal 2011, the company repurchased approximately $70 million, or 2 million shares of its common stock at an

- 60 -

average price of $35.66 per share. During fiscal 2011, the company repurchased approximately $1.2 billion, or 33 million shares of its common stock at an average price of $36.62 per share. The company also noted that it has approximately $1.3 billion remaining capacity under its existing share repurchase authorization as of the end of the fiscal fourth quarter.

130. On March 22, 2011, Janney Capital Markets issued an analyst report noting the overly bullish forecast made for the back half of FY2011 and anticipated that the Company would be conservative in its guidance following its reckless (and baseless) forecast for FY2011, stating, in pertinent part:

> The Company will give uncharacteristically conservative guidance. After overly bullish guidance for the back half of 2010, we believe the tone will be much more cautious, particularly regarding the first half of the year. We are guilty of originally modeling overly optimistic positive comps for the 2010 holiday despite difficult compares, and what turned out to be a lackluster product cycle. The same can be said about the company management.

131. On March 25, 2011, BB&T issued an analyst report, which stated that the Company would be more conservative in its guidance to skeptical investors. The report noted, in relevant part:

> NO MORE "OVERPROMISING AND UNDERDELIVERING?"
>
> We believe Best Buy provided conservative FY'[12] guidance, particularly given the company's two FY'[11] earnings misses. We believe management has finally begun to believe that it is much better in investors' eyes to "underpromise and overdeliver," rather than the other way around.
>
> *   *   *
>
> For example, we note Best Buy's guidance does not incorporate any share repurchases, despite the fact that the Company repurchased $1.2B of stock in FY'[11], has $1.3B remaining under its existing authorization, and recently issued $1.0B of debt.

6.    **Share Repurchases in FY2011 Are Strongly Suggestive Evidence of Defendants' Efforts to Mask Sharply Declining Business Performance**

132.    During the first three quarters (February 28, 2010 through November 27, 2010) of FY2011, Defendants simultaneously made false bullish FY2011 financial forecasts with knowledge of weakening business metrics, including comparable store sales declines, TV sales declines, gaming sales declines and increasing inventories, while causing Best Buy to repurchase more than 30 million shares of the Company's common stock in the open market at a total price of $1.1 billion.    While Defendants stated in March 2010 that the Company would repurchase shares in the open market, Defendants made assurances that the Company's earnings forecast did not contemplate achieving earnings forecast through share repurchases, which would reduce shares outstanding and effectively purchase EPS growth.

D.    **Insider Trading**

133.    Collectively, and while in possession of material, adverse, non-public information, defendants Dunn, Kaplan, Lenzmeier, and Trestman sold over $11 million worth of their personally held Best Buy stock during the Relevant Period from the first improper statement made by defendants Dunn and Muehlbauer on March 25, 2010 to December 14, 2010, when the truth was revealed.    The following is a table showing the total sales that occurred during the relevant period:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **DUNN** | 4/1/2010 | 13,848 | $42.73 | $591,765.20 |
| | | **13,848** | | **$591,765.20** |
| | | | | |
| **KAPLAN** | 4/26/2010 | 11,250 | $48.46 | $545,221.13 |
| | 10/26/2010 | 11,250 | $42.87 | $482,268.38 |
| | | **22,500** | | **1,027,489.50** |
| | | | | |
| **LENZMEIER** | 4/23/2010 | 180,000 | $48.05 | $8,649,108.00 |
| | | **180,000** | | **$8,649,108.00** |
| | | | | |
| **TRESTMAN** | 4/21/2010 | 16,835 | $46.00 | $774,468.92 |
| | | **16,835** | | **$774,468.92** |
| | | | | |
| **TOTAL** | | **233,183** | | **$11,042,831.62** |

134.   As detailed below, the timing, price and manner in which the share repurchases were made was sharply out of line with past open market share repurchases and consistent with Defendants' real time knowledge of the Company's poor business performance, Defendants' knowledge or reckless disregard of declining business performance outlook, and the falsity of defendants' Relevant Period statements concerning the Company's FY2011 outlook.

**E.    Share Repurchases**

135.   In June 2007, the Board authorized Best Buy management to repurchase $5.5 billion worth of the Company's common stock in the open market.  The stock repurchase program authorization had no expiration date and gave Company executives full discretion to determine the timing of purchases, amount of shares to be purchased and price to be paid per share.  In describing the program, Defendants stated that among the factors it considers in making share repurchases are: (a) cash needs; (b) market price

of the stock; and (c) acquiring shares to offset dilution related equity based incentives. As of February 2008, the Company had $2.5 billion remaining on its repurchase authorization.[8] However, between February 2008 and March 2010 (encompassing FY 2009 and FY2010), the Company did not repurchase any shares in the open market under the 2007 authorization.

### 1.    1Q11 Share Repurchases

136.    As discussed above, on March 25, 2010, as part of the Company's reported 4Q10 and FY2010 revenue and earnings results, Defendants issued an aggressive revenue and earnings forecast for FY2011.  Because the 4Q10 and FY2010 results were buoyed by a number of one-time events, analysts and investors voiced skepticism about the reasonableness of the FY2011 forecasts from the outset:

(a)    "Even with strong FY2011 guidance, some investors remain skeptical about how the Company will achieve its goals."

(b)    "Guidance for strong operating margin seems optimistic."

137.    Beginning on April 4, 2010, after the aggressive FY2011 financial outlook (and although the Company had not repurchased any shares on the open market since FY 2008), Defendants caused the Company to repurchase a significant block of the Company's stock in the open market.  For example, during 1Q11 the Company

---

[8] During FY 2008, Defendants caused the Company to repurchase $461 million worth of shares in the open market under its June 2006 share repurchase program; no open market repurchases were made in FY 2008 under its June 2007 share repurchase program.  An additional $3.0 billion worth of shares were repurchased in FY 2008 from The Goldman Sachs Group, Inc. ("Goldman Sachs") , pursuant to agreements with Goldman Sachs made in connection with an Accelerated Share Repurchase Program ("ASR") authorized by the Board in June 2007 in accordance with the $5.5 billion share repurchase program.

repurchased 2.5 million shares at an average price of $43.47 per share.

| Period | Start | End | Shares | Avg. Paid | Avg. Period[9] | Total $ |
|--------|-------|-----|--------|-----------|----------------|---------|
| 1Q | 2/28/201 | 4/3/2010 | 0 | | $39.35 | $0.00 |
| 1Q | 4/4/2010 | 5/1/2010 | 803,700 | $46.21 | $44.91 | $37,138,977.00 |
| 1Q | 5/2/2010 | 5/29/201 | 1,734,100 | $42.20 | $41.96 | $73,179,020.00 |
| Total | | | 2.537.800 | | | $110.317.997.00 |

### 2.    2Q11 Share Repurchases

138.    On June 15, 2010, Defendants caused the Company to report its 1Q11 financial results.  The reported 1Q11 results missed Wall Street revenue expectations and also missed earnings expectations by $0.14 per share.  Best Buy's poor 1Q11 financial results included weak comparable store sales growth of only 2.8%, compared to expectations of up to 5% growth, and SG&A increases of 12%.  In light of the poor 1Q11 results, Defendants faced additional skepticism, and indeed criticism, from analysts and investors over the basis of the Company's FY2011 earnings forecast going forward and how in fact Defendants planned on accelerating growth to meet the FY2011 earnings forecast:

(a)    "What signs are you seeing . . . to give you confidence . . .?"

(b)    "[Y]our revenues did fall short of expectations . . . is your confidence still in the $3.45 to $3.60 range . . .?"

(c)    "I . . . don't understand . . . how given your performance in Q1 you could be more optimistic . . .?"

---

[9]  Represents average "adjusted" close prices which have been adjusted for dividends (excludes the 6/30 dividend or simply uses the average actual close prices (unadjusted)).

139.   Notwithstanding 1Q11 poor financial results and direct challenges from securities analysts to the reasonableness of the FY2011 financial forecast going forward, Defendants reiterated all aspects to the aggressive FY2011 revenue forecast of comparable store sales growth of 1% to 3% and earnings of $3.45-$3.60 and 5%-7% revenue growth.   During 2Q11, Defendants caused the Company to repurchase a whopping $600 million worth of Best Buy stock between May 30, 2011 and August 28, 2011, removing more than 17 million Best Buy shares from the market.  As would be reported later, these shares would ultimately have a positive impact on expected FY2011 EPS of approximately $0.10 per share:

| Period | Start | End | Shares | Avg. Paid | Avg. Period | Total $ |
|--------|-------|-----|--------|-----------|-------------|---------|
| 2Q | 5/30/201 | 7/3/2010 | 4,739,100 | $35.68 | $37.00 | $169,091,088.00 |
| 2Q | 7/4/2010 | 7/31/201 | 4,826,000 | $34.71 | $34.33 | $167,510,460.00 |
| 2Q | 8/1/2010 | 8/28/201 | 7,720,400 | $33.43 | $33.09 | $258,092,972.00 |
| Total | | | 17,285,500 | $38.69 | | $594,694,520.00 |

140.   On September 14, 2011, Defendants caused the Company to issue its 2Q11 financial results, reporting earnings which blew through Wall Street earnings expectations by $0.20 per share.  The EPS growth was not a result of strong overall sales and increased revenue, however, but the direct result of sales of certain high margin smartphones and mobile products, which represented a very small part of the Company's overall sales, a lower tax rate and Defendants' manipulation of the financial "levers," which Defendants said would help allow the Company to report EPS growth even in the face of declining revenues such as sharply reducing costs.

141.   In a surprise move, on September 14, 2010, Defendants incorporated the

EPS impact of its share repurchases into the forecasted FY2011 EPS results and increased earnings EPS forecasts by $0.10 for the remainder of FY2011. The earnings forecast increase was in sharp contrast to the Company's sales performance figures. Margins, inventory, and market share for the quarter were declining or significantly lower than expectations, continuing a trend that defendants knew had begun earlier in the year. The declining metrics caused the Company to reduce its FY2011 revenue forecast by up to $1 billion. Again securities analysts and investors struggled to see the reasonableness of the Company's increased earnings forecast, especially in light of the revenue reduction.

142. The share repurchases in 3Q11 continued; between August 29, 2010 and November 27, 2010, Defendants caused the Company to repurchase another 11 million shares at a total cost of $420 million at an average share price of $38.69.

| Period | Start | End | Shares | Avg. Paid | Avg. Period | Total $ |
|--------|-------|-----|--------|-----------|-------------|---------|
| 3Q | 8/29/201 | 10/2/201 | 5,708,000 | $34.92 | $35.98 | $199,323,360.00 |
| 3Q | 10/3/201 | 10/30/20 | 2,838,700 | $42.16 | $41.45 | $119,679,592.00 |
| 3Q | 10/31/20 | 11/27/20 | 2,361,000 | $43.61 | $43.36 | $102,963,210.00 |
| Total | | | 10,907,700 | $38.69 | | $421,966,162.00 |

**3. Defendants Pre-Announce FY2011 Financial Results Only Two Weeks into 4Q11 and Abruptly Halt Share Repurchases, Strongly Suggesting Huge Repurchases to Date Were Intended to Mask Business Performance Declines**

143. On December 14, 2010, Defendants caused the Company to announce sales and earnings misses for 3Q11 and pre-announced reduced guidance for FY2011 from $3.55-$3.70 to as low as $3.20 – below even the $3.40-$3.60 EPS projected in March 2010. Defendants cited the very same business performance weaknesses that were

admittedly known to them as early as June 2010: domestic sales and revenue weakness, comparable store sales declines, market share declines, TV, computing and gaming sales declines. The FY2011 EPS guidance reduction to below previous forecast levels was notwithstanding that Defendants had caused the Company to repurchase over 30 million shares, which would positively impact FY2011 EPS results by at least $0.12.

144. The amount, timing and quantity of cash expenditures on repurchases were in sharp contrast with zero repurchases made during FY 2009 and FY2010. And Defendants' abrupt stoppage of share repurchases as of November 27, 2011, without a single additional share repurchase until at least January 30, 2011, is strongly suggestive of Defendants' intent to use share repurchases to mask business performance declines and efforts to inflate EPS. When Black Friday sales were dismal (notwithstanding false representations on November 26, 2010) and the forecasted earnings proved to be irretrievably out of reach, even with continued repurchases inflating EPS, Defendants caused the Company to abruptly stop the share repurchases. Defendants did not repurchase any shares between November 28, 2010 and January 29, 2011, despite the fact that the Company still had $1.2 billion remaining on its 2007 share repurchase authorization:

| Period | Start | End | Shares | Avg. Paid | Avg. Period | Total $ | Q Total $ | Q Total Shares | Q Avg. paid | Q Avg. trade |
|--------|-------|-----|--------|-----------|-------------|---------|-----------|----------------|-------------|--------------|
| 4Q | 11/28/2010 | 1/1/2011 | 0 | | $37.64 | $0.00 | | | | |
| 4Q | 1/2/2011 | 1/29/2011 | 0 | | $35.04 | $0.00 | | | | |

145. The chart below illustrates timing and values of share repurchases and the abrupt stoppage of share repurchases immediately after Black Friday.

**4.    FY2011 Stock Repurchases Value of Shares Purchased**



**5.    FY2011 Repurchase Costs Totaled More Than 7,000% of Free Cash Flow Generated in the First Nine Months of FY2011 and 267% of Total FY2011 Free Cash Flow**

146.    In addition to the timing and amount of the share repurchases, and in conjunction with the abrupt stoppage of repurchases, the amount of free cash flow spent by the Defendants to repurchase shares is nothing less than shocking: During the first three quarters of FY2011 (February 28, 2010 through November 27, 2010), the Defendants caused the Company to spend 7,000% of its free cash flow and 267% of total free cash flow in FY2011 on Company shares.  This resulted in significant negative cash flow in the same period.[10]

_____

[10] "Free Cash Flow" is a financial metric used to gauge a company's ability to generate cash beyond that necessary to grow at the current rate. It is essentially the amount of money the company could return to shareholders if the company were to grow no

| Best Buy Free Cash Flow | | | | | | | |
|---|---|---|---|---|---|---|---|
| ($'s in millions) | **1Q11** | **2Q11** | **3Q11** | **9 months ended** | **4Q11** | **FY11** | **1Q12** |
| period ended: | 5/29/10 | 8/28/10 | 11/27/10 | 11/27/10 | 2/26/11 | 2/26/11 | 5/28/11 |
| Cash Flows from Operations | 169 | (85) | 461 | 545 | 645 | 1,190 | 1,324 |
| Capital Expenditures | 161 | 181 | 187 | 529 | 215 | 744 | 202 |
| Free Cash Flow | 8 | (266) | 274 | 16 | 430 | 446 | 1,122 |
| $ Amount of shares repurchased and retired per SEC filing | 111 | 594 | 423 | 1,128 | 65 | 1,193 | 480 |
| Shares repurchased as a % of FCF | 1387.5% | -223.3% | 154.4% | **7050.0%** | 15.1% | **267.5%** | 42.8% |

## 6.    Best Buy Share Repurchases Were Consistent with an Effort to Mask Declining Business Metrics

147.    On November 12, 2006, The New York Times ("*NYT*") published an article entitled "FAIR GAME; Why Buybacks Aren't Always Good News."   The article discussed how share buybacks can be used to advance management objectives to inflate EPS while masking business slowdowns or the severity of business slowdowns.   ("But less obvious to investors are the downsides associated with buybacks.   By artificially inflating a company's earnings per share, repurchases can mask business slowdowns, for example.").

148.    A joint publication from The Center for Financial Research & Analysis (CFRA) and The Corporate Library, entitled "Fueling EPS Through Share Repurchases –

---

further. High or rising free cash flow is often a sign of a healthy company that is thriving in its current environment. Best Buy calculates free cash flow as cash flow from operations less capital expenditures.

Who Benefits," states that companies use share repurchase programs to cover up business slowdowns, reduce dilution in connection with option grants and to effect executive compensation metrics. "[I]n too many cases, repurchase programs can mask business slowdowns and can even contribute to an unrealistic picture of economic health by artificially inflating earnings per share (EPS) and EPS growth."

149.  By the end of the Relevant Period, following a series of continuing disappointing financial results, news organizations suggested that Best Buy's stock repurchase program was simply a play to buy time for a demand recovery. On June 22, 2011, *WSJ* published an article entitled "With Share Repurchases, Best Buy Plays for Time," discussing yet another authorization from Best Buy's Board of Directors to repurchase additional shares and suggesting that buybacks boost earnings when income slows. The article stated, in relevant part:

> With Share Repurchases, Best Buy Plays for Time
>
> Retailers in need of a jolt are reaching for buybacks. Is there a risk of becoming dependent on them? Electronics retailer Best Buy said Tuesday its board had authorized a $5 billion buyback program, enough to purchase a whopping 40% of the company's shares. Like office-supply retailer Staples, Best Buy has suffered from price competition eating into profits. Buybacks can boost earnings per share even if net income stagnates.
>
> *  *  *
>
> Buying time with share repurchases won't solve the retailer's sales conundrum.

150.  Throughout the Relevant Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operation, and prospects. Specifically, Defendants issued improper statements in Company press releases and conference calls that touted the Company's positive

financial results, significant growth, and presented aggressive forward guidance. However, unbeknownst to the public, the Company was facing declining demand for its products and Defendants had no reasonable basis to present such aggressive forecasts as they had. In reality, the Company was encountering lowered demand and weak sales for its flag-ship units, including its TVs, entertainment hardware, and software products. Yet, instead of lowering Best Buy's earnings guidance accordingly, Defendants increased the Company's earnings guidance, assuring investors that sales would pick-up in the back-end of the fiscal year.

### F.    Securities Claims Upheld

151.    As a result of Defendants' actions described herein, a shareholder class action (the "Class Action") was filed in the U.S. District Court for the District of Minnesota in 2011.[11] The plaintiffs to the Class Action asserted claims against Best Buy, along with defendants Dunn, Muehlbauer and Vitelli, for violations of the Securities Exchange Act of 1934. On August 5, 2013, the Honorable Donovan W. Frank ("Judge Frank") of the U.S. District Court for the District of Minnesota sustained certain of the claims against the defendants. Judge Frank ruled that statements claiming that the Company was "on track to meet or exceed our annual guidance" and that "earnings are essentially in line with our original expectations for the year" were not forward-looking and were, therefore, actionable as a statement of present condition. Consequently, they were not subject to the safe harbor provision of the Private Securities Litigation Reform

---

[11] *See IBEW Local 98 Pension Fund et al. v. Best Buy Co. Inc., et al.*, No. 11-cv-00429 (D. Minn.).

- 72 -

Act ("PSLRA").  Judge Frank further found that the allegations of scienter as a whole gave rise to an inference that Defendants acted with the required state of mind that is at least as compelling as any opposing inference of non-culpable conduct.[12]  In other words, Judge Frank found indicia that Dunn, Muehlbauer and Vitelli participated in a scheme to defraud investors.

152.    Accordingly, as a result of Defendants' breaches, the Company has been damaged.

## DERIVATIVE AND DEMAND ALLEGATIONS

153.    Plaintiff brings this action derivatively in the right and for the benefit of Best Buy to redress the breaches of fiduciary duty and other violations of law by Defendants.

154.    Plaintiff will adequately and fairly represent the interests of Best Buy and its shareholders in enforcing and prosecuting its rights.

155.    As a result of the misconduct set forth herein, on November 26, 2013, Plaintiff issued the Demand pursuant to Minnesota law on the Board to commence an

---

[12]  The PSLRA imposes materially heightened pleading standards in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter.  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002).  To meet these heightened standards, a complaint must specify each statement alleged to have been misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.  *Id.* at 1085.  With respect to pleading scienter, the PSLRA requires plaintiffs to state with particularity facts giving rise to a strong inference that a defendant acted with the required state of mind.  15 U.S.C. § 78-u4(b)(2).  The inference of scienter must be more than merely reasonable – it must be cogent and compelling, meaning that a complaint will only survive if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007).

action against certain current and/or former directors and executive officers of the Company.  *See* Exhibit A.

156.    On December 24, 2013, Plaintiff's counsel received a letter from Skallerud of Best Buy's Legal Department, confirming that the Board received the Demand.  In addition, and without citing any provision of Minnesota law, Skallerud's letter requested "appropriate documentation" of Plaintiff's ownership of Best Buy stock.  *See* Exhibit B.

157.    Despite the fact that Skallerud's letter cited no authority in connection with the request for documentation of Plaintiff's Best Buy stock ownership, on January 17, 2014, Plaintiff's counsel sent a letter to Skallerud which included the requested documentation.    A true and correct copy of the January 17, 2014 correspondence is attached hereto at Exhibit C.

158.    Notwithstanding the fact that it took nearly a month for defendants to even acknowledge the Demand, now over ***eighteen months*** have passed and the Board has provided Plaintiff with literally no substantive response to the Demand whatsoever.

159.    Clearly, the Board's complete disregard of the Demand, which resulted in its functional refusal, is improper and demonstrates the Board's lack of diligence and good faith.

160.    Thus, this shareholder derivative action should be allowed to proceed.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

161.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Best Buy disseminated accurate, truthful and complete information to its shareholders.

163.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Best Buy shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

164.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

### COUNT II
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

165.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

166.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

167.    Defendants willfully ignored the obvious and pervasive problems with Best Buy' internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

168.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

169.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.    Defendants owed and owe Best Buy fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Best Buy the highest obligation of good faith, fair dealing, loyalty and due care.

171.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

172.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Best Buy has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

173.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

174.    Plaintiff, on behalf of Best Buy, has no adequate remedy at law.

## COUNT IV
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

175.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.    By their wrongful acts and omissions, the Defendants were unjustly

enriched at the expense of and to the detriment of Best Buy.

177.    Plaintiff, as a shareholder and representative of Best Buy, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V
## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

178.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Best Buy, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Best Buy to misrepresent material facts regarding its financial position and business prospects.

180.    As a direct and proximate result of Defendants' abuse of control, Best Buy has sustained significant damages.

181.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

182.    Plaintiff, on behalf of Best Buy, has no adequate remedy at law.

## COUNT VI
## AGAINST ALL DEFENDANTS FOR GROSS
## MISMANAGEMENT

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.    Defendants had a duty to Best Buy and its shareholders to prudently

supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Best Buy.

185.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Best Buy in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Best Buy' affairs and in the use and preservation of Best Buy' assets.

186.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Best Buy to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Best Buy, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Best Buy.

**COUNT VII**
**AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF**
**FIDUCIARY DUTY FOR INSIDER SELLING**

187.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

188.    At the time of the stock sales set forth herein, defendants Dunn, Kaplan, Lenzmeier, and Trestman knew, but did not disclose publicly, the proprietary non-public and material information described herein, and defendants Dunn, Kaplan, Lenzmeier, and Trestman made the stock sales described herein on the basis of and because of their knowledge of this proprietary and material information.

- 78 -

189.    The information described above was proprietary non-public information concerning the Company's financial conduct and future business prospects. It was a proprietary asset belonging to the Company, which defendants Dunn, Kaplan, Lenzmeier, and Trestman used for their own benefit when they sold Best Buy stock.

190.    Plaintiff, as a shareholder of Best Buy, seeks restitution from these defendants.

191.    As a result of defendants Dunn, Kaplan, Lenzmeier, and Trestman insider trading, Best Buy has been injured and is entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing Best Buy to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.      Awarding to Best Buy restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  June 5, 2015

**ZIMMERMAN REED, PLLP**

By:  */s/ Carolyn G. Anderson*
Carolyn G. Anderson, No. 275712
Patricia A. Bloodgood, No. 157673
June P. Hoidal, No. 033330X
1100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
carolyn.anderson@zimmreed.com
june.hoidal@zimmreed.com

*Liaison Counsel for Plaintiff*

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

*Counsel for Plaintiff*